[No. 6,929.]

WEILL, TREASURER ETC. *v.* KENFIELD, CONTROLLER ETC.

CONSTRUCTION OF STATUTE — TECHNICAL WORDS. — Where a word, having a technical as well as a popular meaning, is used in the Constitution or a statute, the courts will accord to it its popular signification, unless the very nature of the subject indicates, or the context suggests, that it is used in its technical sense.

CONSTITUTIONAL LAW — READING OF BILLS. — Accordingly, § 15, art. 4, of the Constitution, is to be construed as requiring every bill, before it shall become a law, to be read *at length* on three separate days in each House, unless, in case of urgency, two-thirds of the House where such bill is pending shall, by a vote of yeas and nays, dispense with this provision, either as to the manner of *reading,* or as to the reading on *separate days.*

ID.—UNCONSTITUTIONAL STATUTE.—Upon an application for a writ of mandamus to compel the defendant, as Controller of the State, to transfer a certain sum from the *General* to the *School Fund,* in obedience to the statute of Jan. 23rd, 1880, requiring him to do so, it appearing from the Journal of the Assembly that the bill had not been read in that House three times at length, and that the constitutional provision requiring it to be so read had not been dispensed with: *Held,* that the act was void; and the application denied.

APPLICATION for writ of mandamus.

The proceedings of the Assembly with reference to the bill referred to in the opinion, as they appear in its record, are set out at length in the petition; and from this it appears that the bill was not read at length on its first and second reading, but that the clerk read the title of the bill, and the enacting clause, and a portion of the first section only, and that thereupon the Speaker interrupted the reading by announcing, on the first occasion, " This is the first reading of the bill," and on the

second occasion, " This is the second reading of the bill " ; and that no member demanding a further reading, it was not further read.

The other facts are stated in the opinion.

*W. H. Sears, G. W. Tyler, John W. Satterwhite,* and *Charles N. Fox,* for Plaintiff.

*E. A. Davis, J. H. Dickenson, John S. Enos,* and *A. A. Cohen,* (as *amicus curiæ*) for Defendant.

In' bank, McKinstry, J. :

In the view we take of this application, it becomes unnecessary to decide that this Court has or has not original jurisdiction to issue the *writ of mandamus.*

The important question presented is, whether every bill introduced into either House of the Legislature, (unless the requirement in that regard of § 15, art. 4, of the Constitution is dispensed with by a two-thirds vote duly recorded) must be *read three times;* or whether the requirement has been complied with by reading the title and a *portion* of a bill twice, and reading the whole *once.* The section reads as follows :

" No law shall be passed except by bill. Nor shall any bill be put upon its final passage until the same, with the amendments thereto, shall have been printed for the use of the members ; nor shall any bill become a law unless the same be read on three several days in each House, unless, in case of urgency, two-thirds of the House, where such bill may be pending, shall, by a vote of yeas and nays, dispense with this provision. Any bill may originate in either House, but may be amended or rejected by the other ; and on the final passage of all bills they shall be read at length, and the vote shall be by yeas and nays upon each bill separately, and shall be entered on the Journal; and no bill shall become a law without the concurrence of a majority of the members elected to each House."

It is claimed by petitioner that the words " be read " in the clause " nor shall any bill become a law unless the same be read

on three several days," etc., should receive an interpretation "technical" and special. It is admitted that all bills—unless the provision is dispensed with—must be *read* on three several days, but it is insisted that the framers of the Constitution, and the people who ratified that instrument, must have intended that all bills should be read in the manner, and to the extent only, that it had been the legislative practice to read them prior to the adoption of the Constitution.

When, however, a word is found in a section of the Constitution or of a statute, such as is sometimes employed in a sense specially appropriate to a science, art, or business, and which differs from its popular signification, the courts will accord to it its popular meaning, unless the very nature of the subject indicates or the *context* suggests that it is employed in its technical sense. And this presumption, that language is used with the meaning ordinarily attached to it, is perhaps strengthened in the present case, where the admitted purpose was to regulate, in the organic law, the mode of proceeding in respect to the passage of bills through the two Houses of the Legislature, and to correct abuses which had grown up under the practice previously existing. It cannot be presumed, at least, that the members of the Constitutional Convention, whose duty it was to prepare an instrument to be submitted to the *people*, and who had, therefore, received the direction "*loquendum ut vulgus*," intended to employ words, (the commonly received meaning of which is indisputable) in a sense peculiar to Cushing's Manual, or in a sense (if there be such) in which they constitute a portion of the technology of the science of parliamentary law.

It cannot be maintained that the verb "to read," in all its moods and tenses, when applied to bills for acts pending before legislative bodies, has acquired a purely technical signification which *absolutely excludes* its ordinary meaning. The authority upon parliamentary law cited by counsel, Mr. Cushing, does not so declare. That writer, (in his *Law and Practice of Legislative Assemblies*) after describing the practice, including the reading in full, which at one period prevailed in the House of Lords and the Commons, adds: "In modern times no essential difference has taken place, except that bills are not now accom-

panied by breviates, and it is not the custom to read any bill at length. The necessity for reading is superseded by printing; and the *rule which requires a bill to be read is now satisfied* by reading the title and a few of the first words." (§ 2141.) In the next section of the same work he says: " As the contents of a bill cannot *regularly be known* to the House until it is read, it is not usual," etc. ; and in the section following he states that the " *ancient practice* " was substantially adopted by the House of Representatives of Congress in 1789. Jeremy Bentham, in his *Essay on Political Tactics*, declares that, in his day, the three readings were " *purely nominal* "; the clerk confined himself to reading *the title* and the first words.

Both the writers above mentioned refer to this *nominal* reading, or reading which " *satisfies the rule*," as a *substitute* for the reading itself. But even if it shall be found that this nominal reading is sometimes spoken of as the " reading of the bill," the actual reading is also designated in the same manner. It is enough for our purpose to ascertain that when a bill is really read it always is *said to be* read. Even if it be admitted that the reading of the title has been spoken of as the reading of a bill, it is quite certain that in legislative parlance the " reading " includes the actual reading.

As to the *context*. It was not claimed at the argument that other sections of the Constitution cast any light upon the question we are considering, but it was urged by counsel that the subsequent clause in the same section—" on the final passage of all bills, they shall be read at length," clearly indicates that the *first* and *second* readings may be of a portion only. But this attaches more consequence to the words " at length " than we think is their due. The language is given effect and its sufficient purpose discharged when it is construed as requiring every bill to be *read* before its *final* passage, notwithstanding the reading may have been twice dispensed with by a vote of two-thirds of the House. On the final passage it is to be *read at length*, and this, of course, in its then condition, *i. e.*, with all of the amendments. And here we may remark, (in reference to any suggestion, that the framers of the Constitution must be presumed to have been familiar with the former mode of doing

business in the Legislature, and could not have intended so vain an act as the reading of a bill *throughout* when they must have known that the legislators would have printed copies of the bills before them) that it is perfectly apparent it *was* intended, before any bill should be put upon its final passage, that it should be both *printed* with its amendments and read at length, because § 15 of art. 4 commands the printing and the reading also.

It was also claimed at the argument, that the clause " unless, in case of urgency, two-thirds of the House where such bill may be pending shall by a vote of *yeas and nays* dispense with this provision," relates only to the reading of bills on *separate days*, and not to the manner of the reading. But the obligation imposed to read on three several days is *one*, and it cannot be doubted that the power to dispense may be employed with reference to each and every portion of this obligation. The section as distinctly requires all bills to be *read* as it requires them to be read on separate days. If, therefore, the clause last quoted relates only to the *several days*, the first and second readings must be " at length," unless the words " be read " have *always* a technical meaning when applied to legislative action with reference to bills for laws. That point, however, we have already passed upon, and the suggestion is quite aside from the immediate purpose, which is to ascertain whether there be anything in the *context* which demands that the alleged technical rather than the popular meaning shall be placed upon the words " be read."

Not only do we discover nothing in the context which compels us to depart from the general acceptation of the words, " be read," but we find in the same section language which strongly corroborates the testimony of the words themselves. It is manifest that it was the object of the section to provide all necessary checks upon the conduct of the two Houses ; to prohibit abuses, and to prevent hasty and ill-considered legislation. The Constitution is a limitation upon, not a grant of, legislative power, and the Legislature may adopt any mode of passing laws not prohibited by it. We were informed that the present Legislature has very wisely provided for the printing of bills at or be-

fore the first "reading." But the Constitution does not *require* them to be printed until immediately before their final passage. If, then, they need not in any case be actually *read* before they are about to be put on their final passage, the Constitution contains no mandatory clause by which the contents of bills shall be made known to members until that stage of the proceeding is reached. Thus several of the most efficient obstacles to reckless legislation would be construed out of the instrument. It would certainly avail little as a practical restriction, that bills should "be read" on three several days, if two of the readings, so called, were not readings at all, unless the Constitution itself provided some other efficient mode of making their contents known prior to the eve of their final passage.

The petition for the writ, and statements of counsel, as well as the history of the legislative department of the State Government, establish that, prior to the adoption of the present Constitution, it was the practice, when a bill was taken up, for the Secretary or Clerk to read the *title*, and to proceed to read a section or more, when he was interrupted by the President or Speaker, who announced—no objection being made—"The first (or second) reading of the bill," etc. This was the course pursued in the Honorable the Assembly with respect to the particular bill which resulted in the act, the validity or invalidity of which we are called on to determine. It was admitted that, in accordance with parliamentary usage, as the same existed in this State prior to the present Constitution, the Speaker could not have declared the bill to have been read had any single Assemblyman objected, but that in case of such objection, the bill must have been read in fact. In other words, the parliamentary law required that all bills should actually be read, unless the reading was dispensed with by unanimous consent. The actual reading was usually unanimously waived; but when the reading was waived, the formal announcement of the Speaker, that the bill had been read, did not convert into a reading that which was not a reading, for this would make the waiver of a thing the equivalent of the thing itself. If all remained silent when the reading was interrupted, all assumed the bill to have been read, and it was ordinarily so entered in the journals. But this

did not make a reading in fact, and we are of opinion that it was (among other things) to do away with this acquiescence by silence that the clause in § 15, which we have been treating, was inserted.

It was intended by and declared in the clause so often referred to, that the reading of a bill shall no longer be *implied* from the mere silence of Senators or Assemblymen, but that the consent of the House in which the bill is pending, to a waiver of the actual reading, shall be indicated only by a formal vote of " yeas and nays," when two-thirds shall declare that an " urgency " has arisen which renders it proper to dispense with the reading. The vote upon dispensing with the reading goes upon the record, so that each representative may be held responsible to his constituents for his conduct in respect to this as well as other questions. The entry must now accord with the fact. It is not to be entered in the journal (as was often formerly the case) that a bill is read when it is not read. It must either be read, or the members be called on to declare affirmatively that it shall not be read because of pressing and urgent necessity.

We do not dare to determine that any constitutional prerequisite to the validity of a law is of no practical service. It may be, as suggested, that the evil effects of the delays caused by the interpretation of the language of the Constitution we have adopted, may more than counterbalance any benefits that may accrue to legislation by the additional opportunities afforded each law-maker to become acquainted with the contents of all bills. But we are not permitted to consider the *policy* of a provision, where its language, as in the present instance, seems to us plain and positive. The whole of this line of argument is disposed of by the phrase, " *Ita lex scripta est.*"

To our respect for a co-ordinate department of the State government is added our personal regard for the distinguished gentlemen who have so ably presented the view of this case from which we have felt constrained to dissent. We might freely admit that *none* of the restrictions of the Constitution would be necessary to the proper discharge of their duties by the honorable gentlemen who compose the present Assembly. But the people may not always be so happy in the choice of their

representatives, and we deem it our duty to require a strict compliance with mandatory provisions intended to prevent evils which have existed in the past, and which may reappear in the future.

Writ denied.

MORRISON, C. J., SHARPSTEIN, J., ROSS, J., THORNTON, J., and McKEE, J., concurred.