[No. 11194. In Bank. — May 1, 1886.]

THE OAKLAND PAVING COMPANY, RESPONDENT, v. C. W. HILTON, APPELLANT.

STREET WORK — CITY OF OAKLAND — STATUTES REGULATING — LEVY AND
    COLLECTION OF ASSESSMENT — LETTING CONTRACT — CONSTITUTIONAL
    LAW. — The application was for a writ of mandate to compel the defend-
    ant, as the city marshal of the city of Oakland, to enter into and execute
    a certain contract for grading, curbing, and macadamizing to the official
    grade a portion of a street in the city of Oakland, and to fix the times
    for the commencement and completion of the work to be done under the
    contract. The proceedings for the work were taken under the act of
    April 4, 1864, and the various acts amendatory thereof, authorizing the
    city council of Oakland to improve the streets within the city limits, and
    under the act of March 18, 1885, providing for work upon streets, and
    for the construction of sewers within municipalities. Neither of such
    acts made any provision for levying, collecting, and paying into the treas-
    ury of the city an assessment previous to the making of a contract for
    letting or doing the work, or the commencement of the work, as required
    by section 19 of article 11 of the constitution of 1879. The petitioner con-

tended that this requirement had been abrogated by an amendment to the constitution proposed by the legislature in 1883, and adopted by the people at the general election in 1884, and that the act of March 18, 1885, providing for a contract for doing street work in advance of an assessment levied, is constitutional. The proposed amendment, during its progress through the legislature, was referred to in the journals of the senate and the assembly as Senate Bill No. 10, but was not copied at large in the respective journals. *Held by Thornton, J., and McKee, J.,* that the failure to enter the proposed amendment at large in the journals was in violation of section 1 of article 18 of the constitution, and that the amendment never took effect.

ID. — *Held further by Thornton, J., and McKee, J.,* that section 19 of article 11 of the constitution was self-executing, and nullified all statutes then existing, or which might thereafter be passed, inconsistent with its provisions.

ID. — *Held by McKinstry, J., and Sharpstein, J.,* that the act of April 4, 1864, as amended by the act of March 29, 1870, is still in force in the city of Oakland, but that the application for a writ of mandate should be denied, as it did not appear from the affidavit of the petitioner that it had complied with the requirements of such acts.

APPEAL from a judgment of the Superior Court of Alameda County.

The facts are stated in the opinion of Mr. Justice Thornton.

*C. T. Johns,* for Appellant.

*John H. Boalt, H. Vrooman,* and *C. T. H. Palmer,* for Respondent.

THORNTON, J.—This is an application by plaintiff, a corporation, to the Superior Court of the county of Alameda for a writ of mandate to the defendant, commanding him, as city marshal of the city of Oakland, to enter into and execute a certain contract for grading, curbing, and macadamizing to the official grade a portion of a street in the city of Oakland, and to fix the times for the commencement and completion of the work to be done under the said contract, which the said defendant had refused to sign and execute.

In obedience to an alternative writ, the defendant appeared, and by his answer showed cause for refusing to execute the contract above referred to, as follows: —

"1. That all the proceedings of the city council of the city of Oakland, purporting to acquire jurisdiction for the ordering of said work, and to order the same, and award to the Oakland Paving Company herein the contract therefor, all as alleged in the affidavit of M. H. Eastman herein, were taken in violation of the first sentence of section 19 of article 11 of the present constitution of this state, for the following reasons, to wit:—

"1. Constitution Amendent No. 1 proposed by the legislature at its regular session in 1883, and attempted to be ratified by the vote of the people at the general election in 1884, never became and is not now a part of the constitution, because said amendment was not entered at large in the journals of the two houses, as provided in section 1 of article 18 of the constitution of California.

"2. Said proposed amendment was read only once in the assembly.

"3. The act of the legislature of the state of California, entitled 'An act to provide for the submission of proposed amendments to the constitution of the state of California to the qualified electors for their approval,' approved March 7, 1883, was passed by the legislature and approved by the governor subsequent to the attempted passage of said constitutional amendment No. 1, and therefore said amendment is not included within the terms and meaning of said act of submission of March 7, 1883, and there never has been and is not now any statute under which said amendment can be properly submitted to the people."

The court below by its judgment ordered the writ to issue as prayed for in the plaintiff's petition.

This judgment is appealed from by defendant. Several questions arise on this appeal which this court is called on to decide.

The proceeding for the street work in this cause is taken under certain acts of the legislature, neither of which provide for levying, collecting, and paying into

the treasury of the city an assessment previous to the making of a contract for letting or doing the work, or previous to the commencement of such work.

Street work or improvements within the limitations of the constitution may be devolved by the legislature on the corporations of cities, and of consolidated cities and counties in this state.

The constitution of 1879 provides that "no public work or improvement of any description whatsoever shall be done or made, in any city, in, upon, or about the streets thereof or otherwise, the cost and expense of which is made chargeable or may be assessed upon private property by special assessment, unless an estimate of such cost and expense shall be made and an assessment in proportion to benefits, on the property to be affected or benefited, shall be levied, collected, and paid into the city treasury before such work or improvement shall be commenced or any contract for letting or doing the same authorized or performed." (Sec. 19, art. 11, of Const.)

This provision of the constitution was before this court, Department Two, for its application and construction in *McDonald* v. *Patterson*, 54 Cal. 245. The case there presented was in regard to a contract under the provisions of the act of April 1, 1872 (Stats. 1871–72, p. 804), relating to the improvement of streets in the city and county of San Francisco, and the application therein was for a writ of mandate commanding the defendant, who was superintendent of streets, etc., of the city and county above mentioned, to execute in his official character a contract for street work in advance of the levy and collection of the assessment referred to in the constitutional provision above quoted. It was held in that case that section 19 of article 11, above set forth, required no legislation to enforce it, and that the provisions of the act of April 1, 1872, relating to street improvements in San Francisco, which authorized the

superintendent of streets to execute contracts for such improvements, in advance of the levy and collection of the assessment, are inconsistent with the section of the constitution referred to, and that they ceased to be operative on the first day of January, 1880. The above decision was approved by this court in Bank by its action in denying a rehearing. Subsequently the same question was presented to this court in Bank in *Donahue* v. *Graham*, 61 Cal. 276, and was decided in the same way, on the authority of *McDonald* v. *Patterson, supra,* thus a second time approving the ruling in that case.

It should be mentioned here that Sharpstein, J., who had concurred in *McDonald* v. *Patterson*, dissented in *Donahue* v. *Graham*, and that McKinstry, J., also dissented. Indeed, the last-named justice never concurred in the ruling of *McDonald* v. *Patterson.*

We see no reason to change the ruling of this court in the cases just referred to. In our judgment, the language of section 19, article 11, above quoted, was not intended to apply only to contracts let under laws to be passed by the legislature after the constitution of 1879 went into effect. It was intended to strike with nullity all contracts made under any laws, in advance of the execution of which no assessment had been levied, collected, and paid into the treasury of the city. The constitutional provision was not retroactive, but prospective. It did not retroact on any contract entered into for street work in accordance with law before the constitution went into operation. It was prospective in affecting with nullity and rendering void any contract entered into after the date just mentioned, and was also prospective in annulling any statute then in force, or which might thereafter be passed, inconsistent with its provisions.

The constitutional provision is prohibitory in its language, and when that is the case, no legislation is required to execute such provision. It is then self-executing,—operating *proprio vigore.* The constitution, in

regard to contracts for street work, presents in itself a complete rule in the particular mentioned. It requires no legislation to make it more complete. Every constitutional provision is self-executing to this extent, that everything done in violation of it is void. (*Brien* v. *Williamson,* 7 How. (Miss.) 14.) The fifteenth amendment to the federal constitution provides that "the right of citizens of the United States to vote shall not be abridged by the United States, or by any state, on account of race, color, or previous condition of servitude." This provision is self-executing to the extent that of its own force it abolishes all distinctions in suffrage based on the particulars mentioned (Cooley on Const. Lim. 133), whether these distinctions existed in a statute subsisting when the amendment went into operation, or whether the statute was subsequently enacted. The same may be said of the provision of the same constitution, that no state shall pass a law impairing the obligation of contracts (art. 1, sec. 10, Const. U. S.), as of all the matters prohibited by section 10 of article 1, just cited. (See *Ewing* v. *Oroville Mining Co.,* 56 Cal. 649.)

Nor is this section 19 limited to prohibiting the legislature from passing laws authorizing contracts in the future in violation of its provisions. It does this, but it does more. It operates on all contracts for street work, whether entered into under laws existing when the section went into effect or under statutes subsequently enacted. Whenever a case arises presenting a contract of the character indicated, it operates to declare such contract void and of no effect. (See *County of Los Angeles* v. *Lamb,* 61 Cal. 198.) In fact, it is the solemn declaration of the paramount organic law operating on all departments of the government, expressed in the clearest and strongest language of prohibition. No act can be done by any department contrary to its provisions. It is a law absolutely controlling the legislative, executive, and judicial departments of the government.

It takes effect on laws already passed, as well as to those to be enacted in the future.

In thus construing this provision in section 19, it is taken in connection with all other provisions of the constitution, especially with subdivision 22 of article 1, and section 1 of article 22. No other provision of the constitution dominates it or changes its interpretation. The language is plain and perspicuous, and we cannot attribute to it any other meaning than that given in the two cases above cited, in which it is interpreted.

In fact, we do not see there is any necessity for the legislature to enact a statute to execute the provisions of the section of article 11 above cited. It would be useless to do so, for the legislature is not called on to perform a duty so useless as to forbid that which is already forbidden.

By the express declaration of the first section of article 22 of the constitution, all laws inconsistent with the constitution ceased when that instrument began to operate. This was so held in *McDonald* v. *Patterson, Ewing* v. *Oroville Mining Company,* and *Donahue* v. *Graham, supra.*

The act of April 1, 1864, entitled "An act to authorize the city council of the city of Oakland to improve the streets, lanes, alleys, courts, and places in said city" (Stats. 1863–64, p. 333), which authorized a contract to be made in advance of an assessment (section 8 of act) to pay for that work, in that is inconsistent with section 19, article 11, of the constitution, and so far it ceased to have any existence when the constitution took effect. When we say ceased, we mean it went out of existence, as if repealed by a valid act of the legislature. When it ceased to have existence it was recalled or revoked. This is the primary meaning of *"repeal,"* as its etymology imports. That a statute may be recalled and repealed by a constitution, as well as by a statute, *"goes without saying."* (See *Cass* v. *Dillon,* 2 Ohio St. 608.)

The section 19 of article 11 repealed the statute so far as pointed out above by implication. (*Cass* v. *Dillon, supra; Ohio* v. *Evans*, 1 Ohio St. 437.) Section 1, article 22, expressly repealed it. We can find nothing in the constitution which saves the above provision of the act of 1864 from the annulling effect of the sections of the constitution above cited.

But it is argued that section 19 of article 11 has, by the operation of an amendment of the constitution, ceased to form a part of it. And that the statute approved March 18, 1885, entitled "An act to provide for work upon streets, lanes, alleys, courts, places, and sidewalks, and for the construction of sewers within municipalities" (Stats. 1885, p. 147), passed subsequent to the ratifying of the amendment, which, like the statute of 1864, provides for a contract for doing street work in advance of an assessment levied, is constitutional. (Stats. 1885, p. 8.)

If the constitution was amended, as contended, prior to the enactment of the act of 1885, the objection to the act of 1885 in regard to the particular above indicated ceases to be of force. If it had not been so amended when the act was passed, the objection still remains in full force.

The following facts were admitted by the parties hereto, as appears in the bill of exceptions in the record:—

"1. That all the proceedings of the city council of the city of Oakland and the advertising thereof ending in the award to the said the Oakland Paving Company, of the contract for the grading, curbing, and macadamizing Tenth Street, between Madison and Alice streets, in said city, and recited in the affidavit of M. H. Eastman, an officer of said the Oakland Paving Company, for and in its behalf, herein applying for writ of mandate, were taken in regular form under the general street act, on page 147 of the published statutes of 1885, and also under the act specially providing for street work

in the city of Oakland on page 333 of the published statutes of 1863–64, and the act to amend the same on page 443 of the published statutes of 1869–70, and — aside from the questions herein of the validity of the constitutional amendment—were sufficient, under any or all of said acts to entitle said, the Oakland Paving Company, to the city marshal's completion and execution of the contract tendered, and receiving the bond therewith, as said tenders are recited in said affidavit.

"2. That the legislature of 1883 proposed to amend section 19 of article 11 of the constitution, by senate bill 10, as the body of the same appears on page 2 of the published statutes of 1883; and that, as appears by the Senate Journal thereof, on pages 16, 50, 59, 103, and by the Assembly Journal thereof, on pages 171, 176, and 255, said proposal was introduced in the senate by Senator McClure, on the eleventh day of January, 1883; was read therein for the first time and placed on file for second reading on the nineteenth day of January, 1883; was therein read the second time and ordered engrossed on the twentieth day of January, 1883; was therein read the third time, and finally proposed on the part of the senate by more than two thirds of all the members elected, on the thirtieth day of January, 1883; was transmitted to the assembly on the last day aforesaid; that on the following day the committee on judiciary therein unanimously reported their opinion that it was not necessary that proposed amendments to the constitution be read more than once before being voted upon; that on the seventh day of February, 1883, therein, the proposed amendment as aforesaid was read the first time, was treated as a resolution, and amendments offered by Assemblymen Storke and Leverson being lost, and the previous question ordered, was finally proposed on the part of the assembly, without further reading, by more than two thirds of all the members thereto elected; that the names of 28 ayes and 5 noes in the senate, and of 68 ayes and 2 noes in

the assembly, voting so thereon, were entered in the journals of the respective houses; and that the entries of said proposal in said respective journals were by identifying references to said senate bill 10, as proposing the said amendment of the constitution, but that the text of the amendment proposed was not copied at large in the respective journals.

" 3. That said proposed amendment to the constitution, as it appears on page 2 of the public statutes of 1883, is the same throughout as the so-numbered 'Amendment No. 1' to the constitution, voted upon by the people for approval and ratification at the next general election, November, 1884.

"4. That one day after the final proposal of said amendment to the constitution on the part of the senate, the senator who had introduced said proposal also introduced the senate bill 228, which afterward became "An act to provide for the submission of proposed amendments to the constitution of the state of California to the electors for their approval," approved March 7, 1883, as the same appears on page 53 of the published statutes of 1883; and that during the progress of said act for submission through both houses, no debate was had, nor amendment made nor offered, nor questions raised—any of them—upon the point whether said constitutional amendment, already proposed, was or was not intended to be included under the provisions of said act.

"5. That thereafter the governor issued his proclamation for a vote of the qualified electors upon three proposed amendments to the constitution at the next general election in November, 1884, and therein included the amendment aforesaid, designating it as "Amendment No. 1," and caused the same to be advertised, in all respects as prescribed by said act for submission; and that it was voted upon, and the votes were canvassed, in all respects as prescribed by said act.

" 6. That at said general election 149,285 votes were

cast for 'Amendment No. 1,' and 7,363 votes were cast against 'Amendment No. 1.'"

The constitution provides for its amendment, and points out the mode specifically by which it shall be done. Inasmuch as the mode of amendment is so established by the paramount law, it is unnecessary to consider the question whether the people of a state may not amend its constitution where no mode is fixed for that purpose in the organic law. When a mode is thus established and ordained, it must be followed. The people of a state may impose a limit upon their own power, and when this is done by the constitution, it must be regarded as much a portion of the paramount law, and as obligatory on the whole people, as any other portion of the constitution. If we do not so hold, we would sanction revolution and violence, and place *lawlessness on a level with law*. The majority of the people, according to law, having adopted the constitution with a mode of amendment in it, we must regard it as a solemn declaration to the minority in the state, as binding as a compact with such minority, that the majority, however large or overwhelming, will never. exercise its irresistible power, its *vis major*, to change the law of its organization as a government in any other way. We hold it to be sound law that a constitution, adopted as was the present constitution of the state of California, is not lawfully changed by the votes of every elector in the state, unless in the mode provided in it. (*Koehler* v. *Hill*, 60 Iowa, 547.) The majority in favor of the change may be so irresistible in its physical power as to command the forced acquiescence or unwilling consent of an inconsiderable minority, but nevertheless a change of the constitution so brought about contrary to its provisions would be lawless, revolutionary, and unconstitutional, and it would be the duty of this court, in obedience to the oath which its members have taken, so to declare it, in favor of any litigant who should invoke its judgment in the course of regular

procedure, though the sole litigant invoking its aid and power should constitute the non-consenting minority. If they did not so declare, the organic law would not afford that protection and refuge which it was intended to afford.

The mode of amendment to be considered here is declared and ordained in article 18, and in the first section thereof, which is as follows:—

"Any amendment or amendments to this constitution may be proposed in the senate or assembly, and if two thirds of all the members elected to each of the two houses shall vote in favor thereof, such proposed amendment or amendments shall be entered in their journals, with the yeas and nays taken thereon, and it shall be the duty of the legislature to submit such proposed amendment or amendments to the people, in such manner and at such time and after such publication as may be deemed expedient. Should more amendments than one be submitted at the same election, they shall be so prepared and distinguished, by numbers or otherwise, that each can be voted on separately. If the people shall approve and ratify such amendment or amendments, or any of them, by a majority of the qualified electors voting thereon, such amendment or amendments shall become a part of this constitution."

It will be observed that an amendment of the constitution may be proposed in either house of the legislature, and if, when so proposed, two thirds of all the members elected to each of the two houses shall vote in favor of it, such proposed amendment *shall be entered in their journals.*

The constitutional requirement is not limited to an entry of the proposed amendment in the journal of one house of the legislature, but in their *journals;* that is to say, in the journal of each house, in that of the senate, and in that of the assembly also. This language is too clear to admit of doubt. It needs no interpretation. It

is so clear that interpretation could not make it clearer. It would only confuse and mystify, instead of making it plainer and more perspicuous. Its meaning is so plain that there is no room or necessity for interpretation.

Now, according to the admitted facts appearing above, the only entry of the proposed amendment upon the journal of each house was by a mode styled "*identifying reference.*" This mode is explained as consisting only of a reference to it as "*senate bill 10.*"

Is this the entry ordained by the constitution? And this leads to an examination of the meaning of the words "*shall be entered in their journals.*"

What, then, is the meaning of these words?

In interpreting the meaning of the language of the constitution, we adopt the same rule which obtains in interpreting statutes, agreements, written or oral, and all written or spoken language. That rule is that we must presume and hold that the words have been employed in their natural and ordinary meaning, unless we find technical words or words of art employed. When such words are employed, we must assume that they are used in their technical meaning. Such is the rule laid down by this court in *Weill* v. *Kenfield*, 54 Cal. 113, in the decision of which case all the court except Justice Myrick concurred. In fact, we think we are at liberty to say that all the members of this court concurred in the above rule as there laid down, for it cannot be supposed that Justice Myrick would have dissented from a rule of law so long and so well established. (See on this point Cooley's Const. Lim. 72, and cases there cited in notes.)

It is hardly necessary to say that the words "shall be entered in their journals" are not words having a technical meaning. They are not words, pertaining to any art or mystery. They are plain words in common, everyday use, both by the learned and unlearned, and plain in their import. No forced or unnatural construction should be put on them, but they should be construed as

having the meaning which men ordinarily attach to them. Said Marshall, C. J., in *Gibbons* v. *Ogden*, 9 Wheat. 188, of the federal constitution: "The framers of the constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have understood what they meant."

The learned Justice Cooley, in commenting on these words, observes (we cite them here as peculiarly applicable): —

"This is but saying that no forced or unnatural construction is to be put upon their language; and it seems so obvious a truism that one expects to see it universally accepted without question; but the attempt is made so often by interested subtlety and ingenious refinement to induce the courts to force from these instruments a meaning which their framers never held, that it frequently becomes necessary to redeclare this fundamental maxim. Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government." (Cooley's Const. Lim. 72, 73.)

We must, then, in accordance with what is said above, construe the words "*shall be entered in their journals*" in their natural and ordinary sense. And first, we remark that the words "*shall be*" are words of command. Such is their natural and ordinary meaning. They are not permissive or only directory, to be heeded or not by the senate and assembly, but mandatory and peremptory, exacting compliance with and obedience to them, and prohibitory of any action conflicting with them. They are not only so by their common meaning, but are declared to be so by the language of the twenty-second section of article 1 of the constitution. The obedience commanded to the mandate of those words is not partial or simulated, but absolute and entire. This mandate

should not be frittered away and rendered illusory by ingenious or subtle refinement, but regarded in their full and honest requirement.

The journals of the houses of the legislature are well-known books. They are required by a provision of the constitution to be kept. "Each house shall keep a journal of its proceedings," is the command of the paramount law. (Sec. 10, art. 4.) The contents of the journals are prescribed. They are the proceedings of the respective houses. They are not only required to be kept, but to be *published*, that the proceedings of each house shall be made known to the people, and that the restraint of publicity shall have its effect on the discharge of their solemn and responsible duties on each individual member of the two houses.

The words "entered in" are to have their natural and ordinary meaning. The word "entered" must be construed in connection with the preposition "in" and their journals. Whatever meaning we may attribute to the word "enter" or "entry" taken by itself, in arriving at its meaning here we cannot dissociate it from the words used with it. We must arrive at the meaning of the word "entered" when connected with the words joined with it, that is, the *context*. We must look at all the words of an instrument to ascertain its meaning (Cooley's Const. Lim. 70, 71); we are not allowed to reject any.

When a paper is directed to be entered in a book, the obvious meaning is that it should be transcribed therein. When a master directs his servant to enter a paper in a book, as when a merchant or a lawyer orders his clerk to enter a written agreement in a volume kept for that purpose, a man of ordinary intelligence would interpret it as meaning that it should be copied into the book. A sufficient reason appears why he should so interpret the direction. Papers are copied into a book for permanent preservation, that they may be in the future conveniently referred to. The object for so entering a paper

in a book would not be attained unless the paper was copied or written out in full or at length in the book. A merchant would not regard his command to his clerk as obeyed if the clerk only numbered the paper, stated the file where it might be found, and inserted the number and file in the book. If such conduct were persisted in by a clerk, a dismissal from employment as an unfaithful servant would inevitably follow. Such an entry by the number of the paper, and stating the file where it could be found, would not attain one of the main objects of having it entered in a book, which is to preserve its entire text, so that in case of the loss of the paper an identical copy could be found.

The journals required by law to be kept are a record of the proceedings of the houses of the legislature, and so intended. They are, to all intents and purposes, records, made in *perpetuam memoriam rei*, there entered. The *official record* of what is " done and past" in a legislative assembly is called " the *journal*." (Cushing's Law and Practice of Legislative Assemblies, par. 415.) The term "to keep a record" evidently means to *make a permanent record* of the daily proceedings. (Pars. 423 of Cushing's Law and Practice, *supra*, as also pars. 327, 415, 642, of same work.) Officers are appointed by law to make the records. (Pol. Code, secs. 245–261, both inclusive.) They are styled *records* in some of these sections. It is commanded by section 255 that "the minute clerk of the senate and the minute clerk of the assembly must *keep a correct record* of the proceedings of their respective houses." By section 256, that "the journal clerk of the senate *must record each day's proceedings in the journal*, from which they must be read by the secretary each day of meeting, and then be authenticated by the signature of the president." By section 257, the same provision is made as to the journal clerk of the assembly,—"*must record each day's proceedings in the journal*." These journals are to be preserved by an officer

designated by law and appointed for that purpose, the secretary of state. (Secs. 261, 407, Pol. Code.) These journals, or copies of them, properly certified, will be admitted in evidence in any court of justice in this state, by virtue of the statute (Code Civ. Proc., secs. 1855, 1918), and by the common law (1 Greenl. Ev., sec. 482; Cushing's Law and Practice of Legislative Assemblies, par. 427); and perhaps the original journals, and the journals published under the requirement of the constitution, may come within the scope of judicial knowledge. (Sec. 10, art. 4, Const., and Code Civ. Proc., sec. 1975, subd. 3.)

As the journals of the senate and assembly are records, and intended to be such, the obvious meaning of entering a proposed amendment in the journals is to make such amendment a matter of record. Entering in the journals is the same as entering in or on the record. Why should it be entered for any other purpose? And when entered as a record, it has all the effect and subserves all the purposes of a record. The great purpose is to preserve in permanent and enduring form authentic and reliable evidence of the contents of the amendment proposed, that in the form in which it appears on such record, it may be submitted to the electors for ratification by their suffrages, and when ratified, the evidence of what has been ratified may be preserved in an unmistakable, permanent, and enduring form. To furnish and preserve this evidence in a certain and more unmistakable form and manner, the entry must be made in the journal of each house. The journals should be regarded as matter of record, and when questions arise as to what is contained therein, they must be tried and determined by inspection of the record only.

The record in the journals is like other records, and, as Lord Coke declares, "is a monument of so high a nature and importeth in itself of such verity, that if it be pleaded that there is no such record, it shall not re-

ceive any trial by witnesses, jury, or otherwise, but only by itself." (3 Bla. Com. 331.)    There is nothing here in conflict with what is said in *Sherman* v. *Story*, 30 Cal. 256, for there the question arose as to a statute of which it was contended it was not properly published, and the court held to determine this fact it could not look beyond the statute, as it was enrolled, authenticated, and deposited with the secretary of state.    Here the point arises as to a proposed amendment to the constitution, and the law as to enrollment, authentication, and deposit with the secretary of state does not embrace it. (*Koehler* v. *Hill*, 60 Iowa, 554.)

No provision exists in the constitution which allows such proposed amendment to be entered on the journal of either house by an *identifying reference*.    We cannot wipe out the requirements of the constitution by any such euphuism or any device of that character.    The constitutional requirement is imperative and peremptory, and demands obedience.    In *Crosby* v. *Dowd*, 61 Cal. 60, the judgment on foreclosure of a mortgage described the premises as to which the foreclosure was decreed by reference to certain deeds recorded in the recorder's office of Santa Clara County, and stating the books and pages in which they were transcribed and the dates of their recordation.    The property was sold under this judgment.    The purchaser brought ejectment on the sheriff's deed executed to him upon the sale.    This court held that the judgment did not describe the property sold, and that the purchaser could not for that reason recover. The judgment was held to be no judgment at all,—void. The judgment was a record the description in which could not, as in a conveyance, be made good by evidence *aliunde*.    The record must be tried by itself.    Here was a case of *identifying reference*.    Yet the identifying reference was held of no avail.    It was held insufficient in a judgment *inter partes*, but here we are called on to hold it sufficient in a matter where the constitution is most

explicit in its requirements as to what shall go into the record.

If an identifying reference is here sufficient, the reference may as well be to a paper filed in the sheriff's office at San Francisco, or in the recorder's office of the county of Del Norte or San Diego, or in any public or private office in the state or in any state. Concede the power to exist as claimed, that is, to act by identifying reference, and we see no limit to it. It is as unlimited as the sources of places of reference.

The device of an identifying reference is of modern origin. It had its *genesis* in Kansas in 1881, in the " Prohibitory Amendment Cases," which were decided by the Supreme Court of that state at its January term in the year last mentioned. The reasoning by which the learned court reached the conclusion it did is not based on any sound legal principles, but contrary to them. Neither the argument nor the conclusion can command our assent or approval. The argument is illogical, and based on premises which are without any sound foundation, and rest merely in assumption. The provision in the constitution of Kansas is that the " proposed amendments, together with the yeas and nays, shall be entered in the journal." (Art. 14, sec. 1.) The court said: " Is the failure to enter this amendment at length on the journals fatal? *It is well said* by counsel that no change can be made in the fundamental law except in the manner prescribed by that law." The case of *Collier* v. *Frierson*, 24 Ala. 100, is then cited as affirming the above rule, which it does. The court properly stated the conclusions reached in the Alabama case, that " proceedings under a constitution to change that constitution must be in accordance with the manner prescribed by that constitution."

" But this," said the court, " only brings us to the real question in this case."

It then proceeds to state this real question in these

words: "Is a proposition to amend the constitution in the nature of a criminal proceeding, in which the opponents of the change stand as defendants in a criminal action, entitled to avail themselves of any technical error or mere verbal mistake, or is it rather a civil proceeding, in which those omissions and errors which work no wrong to substantial rights are to be disregarded?"

The real question was stated above as follows: "Is the failure to enter this amendment at length on the journals fatal?" The question seems now to be changed. Is it in the nature of a criminal proceeding, or rather, is it a civil proceeding? Certainly it is a civil proceeding. But we are not aware that in either a civil or criminal action errors or mistakes which work no wrong to substantial rights are to be regarded. If the law, whether constitutional or statutory, declares technical omissions or errors or verbal mistakes a violation of a party's right, then such right is substantial, and errors, whether technical or otherwise, or originating in verbal mistakes, work wrong to substantial rights, and are to be regarded by courts of justice in any action, whether civil or criminal. This is the universal rule. If a defendant can only by the paramount law be prosecuted for a public offense on indictment found by a grand jury, he cannot be prosecuted by information which contains the same averments preferred by a prosecuting officer. The trial may be quite as fair and full and as free from error in other respects on his trial on an information as on an indictment, still, the conviction on the trial by the former cannot stand. And this consequence cannot be put aside by pronouncing the proceeding by indictment mere machinery and form. It is a substantial right, assured to him by the law of the land, to have the form or machinery of an indictment employed, and though it is form or machinery, he has a substantial right to it, and no court will or can deprive him of it.

The court, after stating the real question, above quoted, proceeds to remark:—

"Unhesitatingly we affirm the latter [that is, that it is a civil proceeding].

"The central idea of Kansas law, as of Kansas history, is that substance of right is grander and more potent than methods and forms." This is so under all systems of law when occasions arise for its application. The court proceeds thus:—

"The two important vital elements in any constitutional amendment are the assent of two thirds of the legislature and a majority of the popular vote. Beyond these other provisions are mere machinery and forms. They may not be disregarded, because by them certainty as to the essentials is secured. But they are not themselves the essentials."

That the elements mentioned by the learned justice are important and vital cannot be doubted. But that they are the only important and vital elements cannot be conceded. The learned court here assumes, without any reason, that entering on the journals is not vital and important. The convention which framed the constitution of Kansas, and the people who adopted it and made it their paramount law, thought otherwise. This is plainly apparent from their inserting other elements in their constitution. It would be a rash assertion, and one which no sound principle of constitutional law sustains, that the words, "such proposed amendments . . . . shall be entered on the journal," were inserted in the constitution of Kansas to be observed or not, as the legislature or any other department of the government of that state should think proper. If this is form and machinery, it is form and machinery established by the constitution. It is not unsubstantial and non-essential, but a part of the instrument, which all officers are sworn to support, as much as any other portion of the constitution; for when an oath is taken to support the consti-

tution, it embraces the whole instrument.  These pro-
visions may not be disregarded for the reason, says the
court, that by them certainty as to essentials is secured.
We can conceive of no stronger reason why they should
be regarded by legislators and courts.  The constitution
makers inserted them for that reason.  They in effect
ordain and declare that no other mode or form or machin-
ery is permissible to secure certainty in doing the act
permitted.  In declaring that those requirements are
non-essential is in effect saying that the convention
which framed the constitution, and the electors which
ratified their action, spent their time in framing and in-
serting in their organic and paramount law non-essential
and unimportant provisions.

The court then proceeds to give an illustration of a
case which never has occurred, and in all probability
never will occur.  It is a sufficient answer to say that
the question put only proposes one difficulty to solve an-
other, to the solution of which it does not in any whit
tend.

Take the case of a failure by the secretary of state to
publish in any paper whatever.  What, then, would be
the consequence?

The court says further:—

"The records of the proceedings of the two houses are
made, not by the houses themselves, but by clerical offi-
cers.  True, they are under the control of the respective
houses, but in fact the records are made by clerks.  May
they defeat the legislative will?  The constitution does
not make amendments dependent upon their approval
or their action.  To insure certainty and guard against
mistake, journal evidence of the amendment and votes
is prescribed, but this is mere matter of evidence, and
not the substantial condition of constitutional change."

This argument would have force if the clerks were not
officers of the house, and under their control.  If the
houses of the legislature of Kansas were so impotent that

they could not compel their clerks to do their duty and obey their commands, we must say that such argument would prevail, but we must presume that the houses in Kansas were able to have their commands obeyed, and if a clerk refused to obey, they would have the power to put some one in the position who would obey, especially as we are informed that the clerks "are under the control of the respective houses." The clerks are servants, and there is no probability that they will fail to perform the behests of their masters. If they are under the control of the houses, they are their servants, and the journals must be held to be made up by the houses. *Qui facit per alium, facit per se.*

The court speaks of the journal evidence as mere matter of evidence. We agree that journal evidence is evidence, and that of the highest character. But if the court means to say that it is mere matter of evidence, in the sense that any other evidence can be received than that of the journals, we cannot concur. In our judgment, the entry of the proposed amendment on the journal furnishes, unless, perhaps, in the case of its loss or destruction, the only evidence of the contents of the amendment proposed.

Again, "in constitutional changes," said the court, "the popular voice is the paramount act." "True, a popular vote without previous legislative sanction must be disregarded." When this is said, the whole question is conceded, for if the popular vote without legislative sanction must be disregarded, we can know of no legislative sanction, except that given in the mode ordained by the constitution, of which the entry in the journals is a material and essential part. If we can leave out a part of this mode, we can leave out the whole. If legislative sanction only is requisite, why may not that sanction be by a vote of a majority of the members elected to the two houses, instead of two thirds?

The history of the mode in which the amendment was

proposed is given in the opinion, and it does not appear that the *yeas* and *nays* were entered on the journals. The numbers, not the names, were so entered. But clearly this was not sufficient. The meaning is, that the names of those voting *yea* and those voting *nay* shall be so entered. The names are required to be given, for one reason, among others, that they may be known and held to accountability by those they represent. This is not attained by the giving the numbers of those voting *yea* and *nay* respectively. Another reason is, that the names may be counted, so that it may be seen by all that the two-thirds vote was given.

Another reason given by the Kansas court for holding the amendment adopted and ratified is, that amendments so proposed had been previously adopted and recognized as a part of the constitution. In other words, as the legislature had frequently violated the constitution, a subsequent violation should be held to be no violation. Frequent violations of the constitution, in our judgment, instead of inducing courts to hold such violations lawful, is the strongest reason that courts should so exercise their power as to put an end to them. This is the highest duty of courts, and one from which they should not shirk, and which they cannot evade.

The Kansas case substantially holds that the provision as to entry on the journals is directory only, that it is not a mandate which is required to be obeyed. This is a dangerous rule to sanction in the interpretation of constitutions, one wholly repudiated by this court, and which is forbidden by our present law. (Art. 1, sec. 22, Const.)

Finally, the judgment of the learned and able court of Kansas is in conflict with all the judgments of other able and learned courts and jurists on this question.

In 1883 two questions were submitted by the house of representatives of the legislature of Massachusetts to the judges of the Supreme Judicial Court of that state for their opinion. One of these questions, numbered second

on the list, was, "Can any specific and particular amendment or amendments to the constitution be made in any other manner than that prescribed in article 9 of the amendments adopted in 1820?"

The judges who answered the questions were Lemuel Shaw, Samuel Putnam, S. S. Wilde, and Marcus Morton, gentlemen whose fame as great jurists and lawyers is acknowledged in all lands where the principles of the common law are studied and administered. The great Chief Justice Shaw everywhere stands among the ablest of able judges. Their answer was that such amendments could only be adopted in the mode prescribed in the constitution of the state.

They said: "We presume, therefore, that the opinion requested applies to the existing constitution and laws of the commonwealth, and the rights and powers derived from and under them. Considering the questions in this light, we are of opinion, taking the second question first, that under and pursuant to the existing constitution, there is no authority given by any reasonable construction or necessary implication by which any specific and particular amendment or amendments of the constitution can be made in any other manner than that prescribed in article 9 of the amendments adopted in 1820. Considering that previous to 1820 no mode was provided by the constitution for its own amendment, that no other power for that purpose than in the mode alluded to is anywhere given in the constitution, by implication or otherwise, and that the mode thereby provided appears manifestly to have been carefully considered, and the power of altering the constitution thereby conferred to have been cautiously restrained and guarded, we think a strong implication arises against the existence of any other power under the constitution for the same purposes." (See Opinion of Judges, 6 Cush. 574.)

In 1854 a similar question came before the Supreme Court of Alabama, in *Collier* v. *Frierson*, 24 Ala. 108. That able court said: —

"The constitution can be amended in but two ways: either by the people, who originally framed it, or in the mode prescribed by the instrument itself. If the last mode is pursued, the amendments must be proposed by two thirds of each house of the general assembly; they must be published in print, at least three months before the next general election for representatives; it must appear from the returns made to the secretary of state that a majority of those voting for representatives have voted in favor of the proposed amendments; and they must be ratified by two thirds of each house of the next general assembly after such election, voting by yeas and nays, the proposed amendments having been read at each session, three times, on three several days, in each house. (Const. Ala., Clay's Dig., 40.)

"We entertain no doubt that, to change the constitution in any other mode than by a convention, every requisite which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment. We scarcely deem any argument necessary to enforce this proposition. The constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has been said that certain acts are to be done—certain requisitions are to be observed—before a change can be effected. But to what purpose are these acts required, or these requisitions enjoined, if the legislature or any other department of the government can dispense with them? To do so would be to violate the instrument which they are sworn to support; and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment, which is shown not to have been made in accordance with the rules prescribed by the fundamental law."

In this case it was distinctly held that every requisition which is demanded by the constitution must be observed to change the constitution, and the *omission* of any one

of them is fatal to the proposed amendment. Observe the reasoning: that these prerequisites are a part of the constitution, and the disregard of them by any department of the government "would be to violate the instrument which they are sworn to support."

In *State* v. *McBride*, 4 Mo. 303, S. C., 29 Am. Dec. 636, decided at the April term, 1836, of that court, it was held that "the general assembly, acting itself under a power granted by the constitution, can only change the constitution in the manner prescribed to it."

In this case it appeared that the constitution of Missouri authorized the general assembly, at any time, to propose such amendments to the constitution as two thirds of each house shall deem expedient. The court held, in the case cited, that it would look into the proceedings of the legislature to see that all prerequisites had been complied with, and that the proposed amendments had been adopted by the two-thirds vote required.

In *Wells* v. *Bain*, 75 Pa. St. 39 (1874), it is held that when a convention to frame amendments to the constitution is sitting under a legislative act from which all its authority is derived, the submission of its labors to a vote of the people in a manner different from that prescribed by the act is nugatory.

In *Wood's Appeal*, 75 Pa. St. 59 (1874), it is held that such a convention as the one above mentioned has no inherent rights; it has delegated powers only, and must keep within them.

In *Wells* v. *Bain, supra,* the court said:—

"The words 'in such manner as they may think proper,' in the declaration of rights, embrace but three known recognized modes by which the whole people— the state — can give their consent to an alteration of an existing lawful frame of government, viz.:—

"1. The mode provided in the existing constitution;

"2. A law, as the instrumental process of raising the body for revision and conveying to it the powers of the people;

" 3. A revolution.

" The first two are peaceful means, through which the consent of the people to alteration is obtained, and by which the existing government consents to be displaced without revolution. The government gives its consent, either by pursuing the mode provided in the constitution or by passing a law to call a convention. If consent be not so given by the existing government, the remedy of the people is in the third mode, — revolution."

The questions under consideration have been recently (1883) very fully considered by the Supreme Court of Iowa, in the case of *Koehler* v. *Hill*, 60 Iowa, 543.

The constitution of Iowa provides that "any amendment or amendments to this constitution may be proposed in either house of the general assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election, and shall be published, as provided by law, for three months previous to the time of making such choice, and if, in the general assembly so next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the general assembly to submit such proposed amendment to the people in such manner and at such time as the general assembly shall provide; and if the people shall approve and ratify such amendment or amendments by a majority of the electors qualified to vote for members of the general assembly voting thereon, such amendment or amendments shall become a part of the constitution of this state." (Art. 10, sec. 1.)

The eighteenth general assembly of Iowa adopted a resolution introduced into it for amending the constitution of that state by adding a clause at the end of section

26.  This resolution, so adopted, was sent to the senate and adopted in a different shape from that in which it passed the house.  The resolution adopted by the senate was as follows: —

"No person shall manufacture for sale, or sell, or keep for sale, as a beverage, or to be used, any intoxicating liquors whatever, including ale, wine, and beer."

The house, on the return of the resolution, concurred in it as amended by the senate.

The house journal shows that the committee on enrolled bills reported to the house that they had examined the joint resolution, and that the same was correctly enrolled.  Thereupon such enrolled resolution was signed by the members of the house and president of the senate, and approved by the governor.  The joint resolution thus signed and approved was as follows: " No person shall manufacture for sale, or sell, or keep for sale, as a beverage, any intoxicating liquor whatever, including ale, wine, and beer."  This proposed amendment to the constitution, in the form in which it was enrolled, was agreed to by the nineteenth general assembly, and ratified by the electors at a special election, held on the twenty-seventh day of June, 1882.  It will thus be seen that the amendment as adopted was materially in substance different from the one ratified by the electors.  It was not contended in the argument of the cause that this was not so.  The proposed amendment was entered in the journal of the senate as above, but not in that of the house.  (*Koehler* v. *Hill*, 60 Iowa, 559, 560.)  There was, however, an identifying reference in the house journal, and the court held this not a compliance with the constitutional provision.  (*Koehler* v. *Hill*, 60 Iowa, 560.) " It matters not if not only every elector, but every adult person in the state, should desire and vote for an amendment to the constitution, it cannot be recognized as valid unless such vote was had in pursuance of and in substantial accord with the requirements of the constitution." (*Koehler* v. *Hill*, 60 Iowa, 549.)

The court further said:—

"The constitution provides for its own amendment, and the manner in which this may be done is prescribed with particularity, and yet the provisions are ample and readily understood. An amendment may be 'proposed in either house of the general assembly, and if the same shall be agreed to by a majority of the members elected to each of the two houses, the proposed amendment shall be entered on the journals, with the yeas and nays taken thereon.' (*Koehler* v. *Hill*, 60 Iowa, 554, 555.)

"We deem it sufficient to say that if there is any provision of the constitution which should be regarded as mandatory, it is where the constitution provides for its own amendment otherwise than by means of a convention called for that purpose. . . . . The object of the provision cannot be doubted or misunderstood. It is to preserve in the manner indicated the identical amendment proposed, and in an authentic form, which, under the constitution, is to come before the succeeding general assembly. . . . . It is immaterial, however, whether the constitution provides the best method for the preservation and authenticity of the proposed amendment or not, for the constitutional mode must prevail, even if it be conceded some other would have been better. It may be suggested that 'to enter' or 'entering' on the journal does not necessarily mean spreading the same at length thereon. This will be conceded, but that it may so mean must also, we think, be conceded. (See Webster's Dictionary.) Various instances where the words 'to enter' or 'entered' occur in statutes and constitution, may, no doubt, be cited, where they do not mean 'spread at length.' But this is not of much significance, for the object to be attained must be considered in determining the meaning of the word 'entered' as used in the constitution. The evident intent of the constitution is that the proposed amendment should be entered at length on the journal, or at least so entered as to leave no reason-

able doubt as to its provisions. This must be so, or the entering of the yeas and nays can be as readily dispensed with as entering the resolution, and yet this is the constitutional mode of ascertaining whether a majority of the members elected to each house agreed to the amendment. (Cooley's Const. Lim., 2d ed., 141.)

"When the object intended to be accomplished is considered, we think there is no doubt that it is the design and intent of the constitution that a proposed amendment thereto should be so entered on the journals that it can be known by an examination of the journals what it is that has been agreed to by each house of the general assembly which first acts thereon, to the end that the succeeding general assembly may certainly know what its predecessor did. It seems to us that a simple entering on the journal of the title or object of a proposed amendment does not accomplish the intent of the constitution, and the thought that this must be so is much strengthened when regard is had to all the provisions of the constitution. That instrument provides that upon the final passage of a bill the yeas and nays must be taken, and the same entered upon the journal. This necessitates the entering on the journal of the title or substance of the bill to be voted upon. This being so, if no more than this was intended in relation to a constitutional amendment, the provision as to entering it on the journal is unnecessary and meaningless. There is no provision requiring a bill to be entered on the journal, but the constitution does require that a proposed amendment thereto 'shall be entered' on the journals, with the 'yeas and nays.' This must mean that the amendment shall be spread at length thereon, and the yeas and nays set out in the journal in full or at length. No distinction between the two can possibly be drawn." (Cooley's Const. Lim. 556, 557.)

On a rehearing the court further said: —

"We have already seen that the constitution requires

that a proposed amendment to the constitution shall, when agreed to, be entered upon the journal of each house, with the yeas and nays. The eighteenth general assembly disregarded this constitutional requirement. The resolution is not entered upon the journal of the senate in the form that it was adopted by the nineteenth general assembly, and the senate substitute is not entered upon the journal of the house at all. Indeed, it is impossible to determine from the house journal that the senate substitute ever passed the house. It seems fairly inferable from the house journal, pages 502 and 503, that the house readopted the original Harvey resolution, denominating it the senate amendment.

"The constitution, then, having required this entry upon the journal, is the general assembly at liberty to disregard the provisions? Is this constitutional provision mandatory, or simply directory? A mandatory provision is one which must be observed. A directory provision is one which leaves it optional with the department or officer to which it is addressed to obey it or not, as he shall see fit. Courts sometimes exercise the power of declaring statutory provisions directory. Even in the case of a statute the exercise of this power is a delicate one, and must be indulged very sparingly. But in the case of a constitutional provision the exercise of this power is of much more doubtful propriety. Judge Cooley, in his excellent work upon Constitutional Limitations, page 78, as a result of his examination of the authorities upon the subject, holds the following language, which commends itself to us for its evident soundness: 'But the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light

of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules, by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. We are not, therefore, to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance and worthy to be embraced in an instrument which, for a time, at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised, as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument when we infer that such directions are given to any other end; especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication.' We adopt the foregoing quotation as giving expression to our own views. Placing the most liberal construction upon the provision of the constitution under consideration of which it is susceptible, we think it requires at least that the entries upon the journals shall show the terms of the amendment submitted. This is not shown upon the journal either of the senate or house of the eighteenth general assembly. (Cooley's Const. Lim. 643–645.)"

The conclusion reached by the court is that the proposed amendments shall be so entered on the journals of each house as to "show the terms of the amendments submitted."

We cannot see how this conclusion can be refuted.

We will add here that under our constitution no question can be made whether the provision in it for its amendment is mandatory or directory. That question is settled by the constitution itself, which ordains in the most solemn form and manner that each and all of its provisions are mandatory and prohibitory, unless by express words declared to be otherwise. (Art. 1, sec. 22.) This section, in our judgment, not only commands that its provisions shall be obeyed, but that the disobedience of them is prohibited. Under the stress of this rule, it is the duty of this court to give effect to every clause and word of the constitution, and to take care that it shall not be frittered away by subtle or refined or ingenious speculation. The people used plain language in their organic law to express their intent in language which cannot be misunderstood, and we must hold that they meant what they said.

The words "entered upon the journal" are frequently used in the constitution, as in article 4, sections 10, 15, 16, 28.

In section 28, article 4, it is provided that " in all elections by the legislature the members thereof shall vote *viva voce,* and the votes shall be entered on the journal." Can there be any doubt of the meaning here?

Section 10, article 4, is equally clear in its meaning. This is a section that requires each house to keep a journal of its proceedings; and it is further declared that " the yeas and nays of the members of either house on any question shall, at the desire of any three members present, be entered on the journal."

Section 15 of same article has reference to the final passage of bills, and on this " the votes shall be by yeas

and nays on each bill separately, and shall be entered on the journal."

We cannot see any doubt as to the meaning of these words here, "the names of the members voting yea or nay shall be entered on the journal"; and it is further provided that "no bill shall become a law without the concurrence of a majority of members elected to each house." This latter clause gives strength to the meaning attributed to the requirement of the words first above quoted from the section. It was no doubt inserted to settle the question that the courts could look at the journals to see whether, on the final passage, a majority of the members elected to each house had voted for the bill on its final passage. (See *Santa Clara R. R. Tax Case*, 9 Saw. 226.)

Section 16, article 4, ordains that "any bill which may have passed the legislature shall, before it becomes a law, be presented to the governor. If he approve it, he shall sign it; but if not, he shall return it, with his objections, to the house in which it originated, which shall enter such objections upon the journal and proceed to reconsider it." That it is required that the objections shall be made to appear in writing on the journal there can be no doubt. It is not required that the whole message shall be transcribed in the journal, but the constant practice of legislatures is to have the message itself transcribed at large on the journal before they proceed to consider the bill returned further.

No such thing as *identifying reference* is anywhere mentioned or hinted at in the constitution. The words are used which exclude it. The identical thing must appear on the journal, not a reference to it in any way.

Can it be held that the yeas and nays must not appear on the journals when an amendment is proposed? Yet, why does not such reference satisfy the requirements of the constitution in regard to the yeas and nays as well as in regard to the amendment proposed? The language is the same as to both, and if such a reference is sufficient

LXIX. CAL.—33

as to one, it must be as to the other. The list of yeas and nays may be preserved, numbered, and filed, and a reference made to it as well as to a bill by its number.

As to what former legislatures have done in the mode of proposing amendments by reference as above, the only weight which should, in our opinion, be given to such practices is this: that we should be more careful to enforce the constitution as it is written. Because one legislature does not obey the mandate of the constitution is no reason why a subsequent legislature should violate it, or that a court should approve its violation, or hold that by such action the constitutional provision has been erased and done away with.

It should be remembered that the legislature, in proposing amendments to the constitution, is not exercising legislative power. Such is the ruling of this court in *Hatch* v. *Stoneman*, 66 Cal. 632, where it is held that the governor has nothing to do with such proposals.

The power given to the legislature is a grant of power. It has it not without the constitutional provision. The grant is given to be exercised in the mode conferred on the legislature by the constitution. It is so limited by the people acting in the exercise of their highest sovereign power. In such case, the mode is the measure of the power. Its action outside of the mode prescribed is as much a nullity as that of a board of supervisors of a city outside of the statute defining its power in regard to the grading of a street. The rule forcibly stated by Justice Coleridge in *Christie* v. *Unwin*, 3 Perry & D. 208, as applicable to powers conferred by statute, is just as applicable here, for the constitutional provision is a statute ordained by a people as part of its paramount law. "However high the authority," says the learned justice, in the case just cited, "to whom special statutory power is delegated, we must take care that in the exercise of it the facts giving jurisdiction plainly appear, and that the terms of the statute are complied with. This rule ap-

plies equally to an order of the lord chancellor as to any order of petty sessions." The legislature, acting outside of the constitution, is without jurisdiction and its action null.

We are of opinion that section 19, article 11, of the constitution, has never been changed in the mode appointed by the highest law of the state, and that it still stands as it was in the constitution when it was ratified in 1879, unchanged or unaffected by amendment.

It follows from the foregoing that the act of 1885, above mentioned, is, so far as regards this case, unconstitutional, as being inconsistent with the constitution.

We are therefore of opinion that the judgment of the court below is erroneous and should be reversed, and cause remanded for a new trial, in accordance with the views herein expressed.

McKEE, J., concurred.

McKINSTRY, J., and SHARPSTEIN, J., concurring.—We concur in the judgment. In our opinion, the act of April 4, 1864, as amended by the act of March 29, 1870, is still in force. The affidavit for *mandamus* fails to show that the acts above mentioned were complied with.