[L. A. Nos. 2539 and 2540. In Bank.—December 19, 1911.]

## SAN PEDRO, LOS ANGELES AND SALT LAKE RAILROAD COMPANY (a Corporation), Respondent, v. LOUISE M. HAMILTON and M. D. M. HAMILTON, her Husband, Appellants.

## LOUISE M. HAMILTON and M. D. HAMILTON, her Husband, Appellants, v. SAN PEDRO, LOS ANGELES AND SALT LAKE RAILROAD COMPANY (a Corporation), Respondent.

RECLAMATION OF TIDE-LANDS — IMPROVEMENT OF HARBOR BY UNITED STATES — CONTRACT WITH RESPONDENT—CITY LEASE—POSSESSORY CLAIM OF APPELLANT—PROPER FINDING.—Where the government of the United States, while deepening the harbor of San Pedro Bay, contracted with the respondent railroad company to throw the dredged material onto its lands for their improvement, if it would build a retaining wall, which it did, at large expense, and as a result, in addition to the improvement of respondent's lands, some tide lands were also reclaimed, for which it received a lease from the city, afterwards affirmed by law; and appellants claimed a conflicting right of possession under the Possessory Act of 1852 (Stats. 1852, p. 158),—it is held, that without regard to the question whether that act has been repealed, the court properly found that such lands were not suitable for cultivation or grazing within the terms of that act, and that appellants' rights were limited to their actual possession.

ID.—RATIFICATION BY STATE OF CITY'S LEASE OF TIDE-LANDS—CONSTRUCTION OF CONSTITUTION.—Where the state legislature passed a validating act (Stats. 1907, p. 987), the terms of which involved a ratification of the lease of reclaimed tide-lands made to respondent by the city of San Pedro, it is held that such ratification is not precluded by the terms of section 3 of article XV of the constitution, declaring that "all tide-lands within two miles of any incorporated city or town in this state, and fronting on the waters of any harbor, estuary, bay, or inlet used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships, or corporations." That section does not forbid the legislature from leasing such lands or ratifying an invalid city lease.

ID.—VALIDATING ACT NOT SPECIAL LEGISLATION.—The validating act, being general in its terms, and made applicable to all leases of tide-lands made by a certain class of municipalities, which includes the lease in question, is not invalid on the ground that it is special legislation.

ID.—MEANING OF CONSTITUTION AS TO "TIDE-LANDS.".—The words "tide-lands," as used in the constitution are to be construed more broadly than merely including lands covered by the daily efflux and reflux of the tide; they are to be construed to embrace lands which in their natural condition are properly described as submerged lands, and that phrase as used in the constitution will be interpreted so as to prevent any submerged lands in the harbor of cities and towns from falling into private monopolistic ownership by any grant or sale thereof.

ID.—MEANING OF WORD "GRANT" IN CONSTITUTION—ORDINARY IMPORT—"LEASE" NOT INCLUDED.—Though the meaning of the word "grant" has by judicial interpretation been narrowed or enlarged to meet the exigencies of specific cases and the spirit of the law in which that word has been employed; yet the word "grant," as so used in the constitution, is to be taken in its ordinary and generally accepted sense, especially where it is used in connection with the word "sale," in which case both terms convey the idea of parting with the feè for a monetary consideration, and do not embrace the concept of a "lease."

ID.—LEGISLATIVE INTERPRETATION OF CONSTITUTION—ORIGINAL LEGISLATIVE ACT.—Section 3 of article XV of the constitution was originally a legislative act embodied in section 3488 of the Political Code, and the fact that the legislature never construed that provision of the code as forbidding the leasing of tide-lands, and frequently granted such leases, is persuasive, that when the constitutional convention embodied the same provision in the constitution, they viewed it in the same light in which it had been continuously construed by the legislature, as not forbidding leases of tide-lands.

ID.—POLICY OF LAW TO PROMOTE LEASES IN THE INTEREST OF COMMERCE—SUBJECT TO PUBLIC RIGHT.—While it is inconsistent with public policy, as well as with the fundamental law, fully to alienate tide-lands, yet it is in accordance with a wise public policy to lease the same in the interest of commercial enterprise, with proper restrictions as to time, and proper regard to the public use. In such case, no apprehension need be felt as to monopolistic control, but at the expiration of the lease the possession of such lands returns to the state.

APPEALS from judgments of the Superior Court of Los Angeles County and from orders denying a new trial. N. P. Conrey, Judge.

The facts are stated in the opinion of the court.

Grant Jackson, and Keefer & Bowers, for Appellants. John W. Schenck, City Attorney of Los Angeles, Anderson & Anderson, and Leslie R. Hewitt, *Amici Curiæ, also for* Appellants.

A. S. Halstead, Miner P. Goodrich, W. R. Kelly, and Wilfred M. Peck, for Respondent. W. C. Petchner, Benj. E. Page, and H. M. Barston, *Amici Curiæ*, also for Respondent.

HENSHAW, J.—The above entitled cases involve a consideration of the same legal questions. The former case is an action to quiet title, the latter an action in ejectment, both between the same parties.

The facts found by the court, over which there is no controversy, may be briefly stated. In 1903 the government of the United States was engaged in the improvement of the harbor of San Pedro. The work contemplated a deepening of the "inner harbor" (an estuary or arm of the sea), the rectification of the inner harbor lines, the construction of jetties delimiting those lines, and to the seaward the construction of an enormous breakwater which, in a great sweep, or curve, extends across the entrance to the inner harbor, and while protecting it, affords safe anchorage to vessels on its landward side. Much dredging was necessary to deepen the inner harbor. The disposition of the material dredged was important. If cast into the ocean the refluent tides would carry it back to the inner harbor. This being the condition, in April, 1903, the United States government entered into a contract with the San Pedro Railroad Company, by which it was agreed that the corporation would build in the Pacific Ocean, east of the inner harbor and of the government jetty bounding that harbor upon the east, a seawall and retaining wall which would protect and confine not less than 2,500,000 cubic yards of the material dredged by the government from the inner harbor, and permit the government to pump its dredged material onto the corporation's land. The object to be attained was one of mutual benefit to the contracting parties. The government, upon the one hand, would thus safely and economically dispose of the dredged material, and the corporation, upon the other hand, would receive the benefit of this dredged material in the contemplated reclamation of tide and submerged lands fronting on the Pacific Ocean. Thereafter the railroad company obtained a lease from the city of Long Beach, a municipality of the sixth class, whose jurisdiction then extended over the territory in question, to a tract of land including the lands in controversy. It then proceeded at an expense of

thirty thousand dollars to build the retaining wall. The government deposited the materials dredged from the inner harbor within the confines of the wall, and thus were reclaimed from the Pacific Ocean the lands here in controversy. Thereafter on March 23, 1907, the legislature of the state of California passed a validating act ratifying leases of a certain class within which class this lease admittedly comes. Of the greater part of the lands in controversy the railroad company has been in possession under its lease. To a minor portion of the lands, in the possession of Louise M. Hamilton and her husband, the railroad company has claimed the right of possession.

The foregoing outlines the railroad company's claim of title. Louise M. Hamilton, defendant in the one action, plaintiff in the other, claimed a right of possession to a portion of the lands by virtue of her attempt to comply with the provisions of the Possessory Act of 1852. (Stats. 1852, p. 158.) Without regard to the question whether this act has been repealed, it is sufficient to say that the act contemplates the occupation of public lands "for the purpose of cultivating or grazing the same." The court found that none of the lands was suitable for purposes of cultivation or grazing, a finding which, under the circumstances, will excite no surprise. In truth, no serious attempt is made to support the asserted claim of title of the Hamiltons; their possession of a small portion of the land, however, affording sufficient standing ground from which to attack the title of the railroad company.

It was made to appear that the city of San Pedro had made leases similar to the one here in question, and that the city of San Pedro had subsequently become annexed to or amalgamated with the city of Los Angeles. The city of Los Angeles had also from the state acquired certain rights to the lands contiguous to the harbor of San Pedro, which rights it is asserted include the lands here in question. The city of Los Angeles, however, did not connect itself with this litigation, but was permitted through its representatives to file a brief. Other briefs were filed in answer thereto by others interested in the principal question here to be considered.

That question may be thus broadly stated. When the constitution (art. XV, sec. 3) declares "All tide lands within two miles of any incorporated city or town in this state, and front-

ing on the waters of any harbor, estuary, bay, or inlet used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships or corporations," does this language forbid the leasing for a term of any part of such lands?

For the consideration of the question stated, "tide-lands" as thus used in the constitution will be construed more broadly than in the ordinary signification of lands covered and uncovered by the daily efflux and reflux of the tide. It will be construed to embrace lands properly described as submerged lands (*Ward* v. *Willis,* 6 Jones' Law (N. C.) 183, [72 Am. Dec. 570], such as, in major part, the lands here in controversy unquestionably were. The phrase will be so construed to carry out the manifest intent of the framers of the constitution, to protect the harbors of cities and towns from falling into private monopolistic ownership. (*People* v. *Kerber,* 152 Cal. 731, [125 Am. St. Rep. 93, 93 Pac. 878].) Such being the undoubted purpose, it would result in the absolute destruction of that purpose to hold that a city might not convey its tide-lands proper, but might convey into private ownership all of the submerged lands beyond the tide-lands proper. For there thus might be erected an impassable barrier between the city and its own harbor waters, with the resulting monopolistic control of the harbor itself. It will further be assumed that the lands here in controversy front on a "bay." They certainly do not front upon the harbor of San Pedro, for the maps in evidence in the case establish that between these lands and the harbor of San Pedro is a wide jetty, wholly under the ownership and control of the government of the United States. To seaward these lands front upon the Pacific Ocean. They do not even front upon the outer harbor, but upon the open sea. The slight indentation in the shore line upon which they do front is San Pedro Bay, and, as has been said, it will be assumed that this bay is used for purposes of navigation so as to bring the lands within the purview of the language of the constitution.

The legislature, by its general validating act as has been said, admittedly confirmed the lease made by the city of Long Beach (Stats. 1907, p. 987). If this confirmatory act is valid, it, of course, cures any defects in the lease from the town of San Pedro which may be thought to exist by reason of

the lack of power in that municipality.   Against the validity of the act it is contended that it is special legislation.   But this contention is completely answered by *Upham* v. *Hosking,* 62 Cal. 250; *Baird* v. *Monroe,* 150 Cal. 560, [89 Pac. 352], and *Redlands* v. *Brook,* 151 Cal. 474, [91 Pac. 150].   The principle of decision is that such curative acts do not come within the constitutional inhibition against special legislation.   Elsewhere the same principle of decision is uniformly applied. (*Read* v. *Plattsmouth,* 107 U. S. 568, [27 L. Ed. 414, 2 Sup. Ct. 208]; *State* v. *Brown,* 97 Minn. 402, [5 L. R. A. (N. S.) 327, 106 N. W. 477]; *State* v. *Squires,* 26 Iowa, 340.)

This conclusion, then, is a declaration that the legislature did not violate this particular constitutional inhibition against special legislation in the passage of the Curative Act, and thus clears the way for the consideration of the ultimate question first above stated.   In passing it may be said that it is, of course, recognized that the legislative department of the state, like the Congress of our national government, has plenary power over the management and disposition of state lands, subject, of course, in the case of lands under navigable waters, to the paramount right of the national government to exercise a control in the interest of commerce and navigation, and subject also to the trust for the whole public upon which these lands are held by the state—a trust which would forbid the alienation into private ownership of any such considerable part of them as would interfere with the proper exercise of the public trust upon which they are all held.   But with none of these questions does this case concern itself.   The question before us is a much narrower one.   It is the question of the extent of the limitation of this general power imposed upon the legislature by the constitutional mandate.   The constitution has clearly forbidden the legislature from granting or selling lands of the character of those here in controversy. The question is, Did the constitution by this language mean to forbid the legislature from leasing, as contra-distinguished from disposing of the fee, any such lands?

Over the meaning of these words "grant or sale," as thus employed in the constitution, many niceties of reasoning are indulged in and many authorities upon either side are cited. Thus, it is pointed out that section 1053 of the Civil Code provides that a transfer in writing is called a grant, or convey-

ance, or bill of sale, and that the term "grant" in that section and in the succeeding articles includes all these instruments. Again it is pointed out that section 1091, relating to the transfer of real property, provides that an estate in real property, other than an estate at will or for a term not exceeding one year, can be transferred only by operation of law or by an instrument in writing; that section 1092 provides that a "grant of an estate in real property may be made in substance as follows," and that this contemplates a leasehold interest exceeding one year. Again, section 1105 provides that a fee simple title is presumed to be intended to pass by a grant of real property, unless it appears from the grant that a lesser estate was intended, and that by this section the lesser estate referred to must be a life estate or a leasehold estate for years. Again, section 1108 deals with "a grant made by the owner of an estate for life or years." Still further it is pointed out that in *San Francisco & O. R. R. Co.* v. *City of Oakland,* 43 Cal. 502, it is declared that at the present day the word "grant" is effectual to convey an estate in a corporeal hereditament; that the word has now become a generic term applicable to the transfer of all classes of real property; and that in *Commercial Bank* v. *Pritchard,* 126 Cal. 600, [59 Pac. 130], a lease of land for a term of five years is construed to be a conveyance of real property within the meaning of section 1215 of the Civil Code. Upon the other hand, respondent points out that these interpretations have to do generally with recordation acts, and that while section 1053, as above set forth, declares that "a transfer in writing is called a grant, or conveyance, or bill of sale," a transfer itself defined by section 1039 of the same code, is "an act of the parties, or of the law, by which the *title to property* is conveyed from one living person to another," and that in the case of leases the title is not transferred. Attention is directed to such cases as *Simonson* v. *Burr,* 121 Cal. 582, [54 Pac. 87], where it was contended that the lease of the homestead was an abandonment of the homestead right, under section 1243 of the Civil Code, which declares that a homestead is abandoned "by a grant thereof," and this court held that a lease was not embraced within the meaning of grant as there employed; and *Mott* v. *Ruckman,* 3 Blatchf. (U. S.) 71, [Fed. Cas. No. 9881], where the statute provided that no conveyance of a vessel should be

valid unless recorded and the vessel had been leased, the United
States circuit court held that a lease was not included in the
word "conveyance"; and *Des Moines Co. etc.* v. *Tubbessing,*
87 Iowa, 138, [54 N. W. 68], where the court declared: "We
are unable to find a single instance where the word 'grant' is
construed as a 'lease,' without other words to control its mean-
ing." And, finally, the American & English Encyclopedia of
Law (2d ed., vol. 7, p. 487) is cited to the following effect:
"Blackstone enumerates leases as among the primary 'convey-
ances' at common law and in several cases the term 'convey-
ance' has been held to include a 'lease'; but the weight of
authority is to the effect that in its ordinary significance the
term does not embrace a chattel interest in realty." Enough
has been said to show that the meaning of the word "grant"
has by judicial interpretation been narrowed or enlarged to
meet the exigencies of specific cases and the spirit of the law
in which the word is employed. We are still left to determine
the specific meaning as employed in the constitution. And
here resort first must be had to the rule of construction that,
in interpreting the constitution, as in construing a legislative
statute, unless a special definition has been given to a word,
the word shall be taken in its ordinary and generally accepted
sense. (*Harris* v. *Reynolds,* 13 Cal. 514, [73 Am. Dec. 600];
Houghton's Appeal, 42 Cal. 35.) These cases have to do with
the construction of statutes. The applicability of the same
rule in constitutional interpretation is declared in *Oakland
etc. Co.* v. *Hilton,* 69 Cal. 491, [11 Pac. 3]. Indeed, even
if the word have a technical as well as popular meaning, the
latter will be given it unless the context forces the conclusion
that it was otherwise used. (*Weill* v. *Kenfield,* 54 Cal. 111.)
It cannot be gainsaid but that in the ordinary and general
acceptation of the word "grant" and of the word "sale," and
particularly where the two are used in conjunction, as here,
they convey the idea of parting with the fee for a monetary
or other consideration, and do not embrace the concept of a
lease. It would require no explanation if a man declared that
he had granted his farm. But it would require explanation
if he desired to be understood thereby that he had merely
leased it. It would require no explanation if a man should
desire to convey the idea that he had sold his horse or his house,
but it would require much explanation if he said that by the

use of the word "sold" he meant to convey the idea that he had leased his house or let his horse. Only by a resort to meanings given to the words in extreme cases, and not to their generally accepted meaning, can they be stretched to cover and include the idea of leasing.

A resort to the constitutional debates to which we are invited throws no light upon the question. An amendment to the provision as it now stands was offered, authorizing boards of supervisors to lease for a limited period of years, excepting from this provision the board of supervisors and the water-front of the city and county of San Francisco. In the debate which followed little light is thrown upon the question, because the attack was directed principally to the whole section, with or without its amendment. It cannot be determined from the debates, under any consensus of opinion expressed by the debaters, why the amendment was stricken out, and for aught that appears to the contrary it might have been under the view that the section as it now appears authorized leases without the amendment. It might have been because the term of leasing in the proposed amendment was deemed too great or too small, or it might have been because the city and county of San Francisco was excluded from the operation of the provision. It might have been for any of these or for a multitude of other reasons.

Much more light, however, is thrown upon the question by the interpretation put upon it by the body which first declared it, and which, saving for the constitutional restrictions, has supreme charge and control over the public lands,—namely, the legislature. The constitutional provision itself was originally a legislative enactment. It will be found in the early statutes (see Pol. Code., sec. 3488), which, making provision for the sale of swamp, marsh, and tide-lands, excluded from the operation of the law all such lands within five miles of the corporate limits of either San Francisco or the city of Oakland, or within two miles of any other incorporated city or town. The advocates of the constitutional amendment declared in debate that by subdivision 3 they were merely putting into the constitution what for years had been upon the statute books of the state. As this provision originated with the legislature, its interpretation of its own enactment is peculiarly persuasive. Throughout it will be found that the legislature

has never regarded its provision or the constitutional declaration as forbidding the leasing of such lands. The act of the legislature ratifying this lease does not stand alone. An act of the legislature in 1889 (Stats. 1889, p. 305) creates a board of state harbor commissioners for the bay of San Diego. By this act certain sections were added to the Political Code, and one of them (sec. 2605) declares: "The commissioners shall have the right to lease said lands under such established rules and regulations as they may adopt." In 1901 (Stats. 1901, p. 601) the lease of China Basin in the bay of San Francisco was ratified and confirmed by the state. By act of March 26, 1895, (Stats. 1895, p. 194,) the state board of harbor commissioners of San Francisco was authorized "to lease such portion or portions of the seawall as they may deem expedient for such purposes solely, as will be most advantageous to the commerce of the port." The legislature of 1909 ratified and approved amendments to the charter of the city of Los Angeles. (Stats. 1909, p. 1289.) And herein was the provision that the city may "lease by ordinance from the water-front in excess of said 10,000 feet so owned by the city . . . alternate frontages," etc. While in an act granting to the city of Los Angeles the tide-lands and submerged lands of the state within the boundaries of the city (Stats. 1911, p. 1256), it is declared, "that said city or its successors may grant franchises thereon for limited periods for wharves and other public uses and purposes, and *may lease* said lands or any part thereof for limited periods for purposes consistent with the trusts upon which said lands are held by the state of Calfornia." And prior to the adoption of the constitution of 1879, authority to make leases of the tide-lands had been frequently granted by the legislature to the harbor commissioners of San Francisco. (Stats. 1863, p. 406; Stats. 1865-66, p. 853; Stats. 1867-68, p. 408; Stats. 1869-70, pp. 799-800.) Finally, it may be said that by this court there has been a judicial acceptance of the soundness of this interpretation expressed in *Pacific Coast Steamship Co.* v. *Kimball,* 114 Cal. 414, [46 Pac. 275], where the city of Monterey had leased land to a steamship company, which had erected thereon its private wharf, the land being within the corporate limits of the city. In discussing the power of the municipality to make such a lease, the court, speaking through Justice Temple, said: "Wharves are often

appropriated to the use of an individual or a company, and it cannot be doubted that Monterey could lease small portions of its water-front for bathing grounds or for any lawful purpose not injurious to the harbor or an inconvenience to commerce. This being so, I see no reason why it might not lease a small portion to a steamship company for its special use."

But if, after all this, doubt can be entertained, that doubt must be resolved in favor of the power of the state so to lease, from the manifest benefits which will follow such construction, as contrasted with the most obvious detriments to commercial development which would attend the other. The purpose of the constitutional provision was not to blight commercial enterprise, but to foster it. It designed to foster it by preventing the alienation into private ownership of the fee of such lands, whereby all might be acquired and held in private ownership to the destruction of the public use. But it did not mean to abort commerce in embryo or to strangle it in its infancy by putting a ban upon the activities of private commercial enterprises. Saving in San Francisco, most of the improvements of our harbors have been made by private capital. The case last referred to in 114 Cal. 414, [46 Pac. 275], is typical of it, where the sole wharf of the town of Monterey, at which five steamers a week landed, was due wholly to private enterprise and private capital. To hold that the state or that municipalities acting as its mandatories, may not lease, with proper restrictions of time and proper regard to public and *quasi* public use, lands such as these, so that private enterprise and capital may build up the commerce of our seaport cities, is to declare that all such commerce must await the slow and frequently incompetent initiative of the municipalities themselves—municipalities which frequently are unwilling to incur the expense and risk which would be accepted under reasonable terms by private citizens. If municipalities may not so lease these lands, they may not even grant franchises in connection with them, for notwithstanding the well-recognized legal distinctions existing between a lease of land and a franchise involving the use of land for specific purpose, in practical effect the franchise is nothing other than a lease with a right of possession and use for the indicated purposes. (Pol. Code, sec. 2911.) Nor need the slightest apprehension be felt

that the power so to lease may result in a monopoly comparable to that which might follow the power to sell. In the case of sale the title and control over the land are gone. In the case of leases all proper restrictions may be cast about the use. An entry by the lessor may be had for breach of covenant; possession of the land with its improvements after the term of years returns to the municipality and state, and in the mean time the interests of navigation and commerce are not impaired, but are in the highest degree stimulated and fostered. The lease in this instance is typical. Vast expenditures were made which the lessor would never have made, and to a portion of land—a mere fragment of all of the like water-front lands —access is given to a transcontinental railroad for all purposes of inland and marine commerce, while at the expiration of the term of the lease the possession of the lands returns to the state. What policy more beneficial to the state itself than this it would not be easy to point out.

No other matters call for special mention.

For the foregoing reasons the judgments and orders appealed from are affirmed.

Shaw, J., Sloss, J., Angellotti, J., Melvin, J., and Lorigan, J., concurred.

Rehearing denied.