TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 95-901 |
| of | : | |
| | : | July 8, 1996 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| GREGORY L. GONOT | : | |
| Deputy Attorney General | : | |
| | : | |

_____


THE HONORABLE CURTIS R. TUCKER, JR., MEMBER OF THE CALIFORNIA STATE ASSEMBLY, has requested an opinion on the following question:

Consistent with the public trust doctrine, may a public agency trustee of filled tidelands lease a portion of those tidelands to a private party for the construction of a timeshare resort?

CONCLUSION

Consistent with the public trust doctrine, a public agency trustee of filled tidelands may lease a portion of those tidelands to a private party for the construction of a timeshare resort if the project will provide for significant use by members of the general public and further trust uses by increasing opportunities for public access to the shoreline and water-oriented recreation.

ANALYSIS

The question presented for resolution is whether the development of timeshare resorts in former tidelands[1] that were legally filled by a public agency and which are now held in trust by the

---

[1] "Tidelands" have been defined as "those lands lying between the lines of mean high and low tide (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 478, fn. 13), covered and uncovered successively by the ebb and flow thereof (*People* v. *Kerber* (1908) 152 Cal. 731, 733)." (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 258.)

agency pursuant to a statutory grant from the state would be consistent with the "public trust doctrine" under which the property is held. We conclude that the construction and operation of a timeshare resort may be found to be consistent with the public trust doctrine.

We assume for purposes of this opinion that the statutory grant of the tidelands to the public agency[2] and the local and regional land use designations[3] for the property and surrounding trust lands would allow for the construction of a variety of visitor-oriented recreational and commercial uses. We assume that any proposed timeshare resort would be consistent with the land use designations for the particular site, and would be compatible with the uses on the surrounding trust lands.[4]

## A. TIMESHARE RESORTS GENERALLY

A "timeshare project" may be defined as "a development in which the purchaser receives the right in perpetuity, for life, or for a term of years, to the recurrent, exclusive use or occupancy of a lot, parcel, unit, or segment of real property, annually or on some other periodic basis, for a period of time that has been allotted from the use or occupancy periods into which the project has been divided." (7 Miller & Starr, Cal. Real Estate (2d 1990) § 20:8, p. 18.) A timeshare "interval" is the recurring block of time during which each purchaser has the exclusive right to use and occupy a unit within the development, although not necessarily the same unit each time. "It has been noted that by offering for sale temporal units of occupancy, the timeshare developer can substantially lower the purchase price of resort housing and at the same time increase overall profit, while, conversely, by purchasing only that portion of the resort property he will actually use, the buyer lowers his purchase and maintenance expenses, and is no longer required to rent his unit to others to defray ownership expenses." (Am.Jur.2d, New Topic Service, "Real Estate Time-Sharing," § 1.)

First developed in Europe, the timeshare concept was introduced to the United States in the early 1970's when domestic resort developers were having difficulty selling their properties due to an economic recession. (Dubord, *Timesharing Condominiums: Property's Fourth Dimension* (1980) 32 Me.L.Rev. 181; Gunnar, *Regulation of Resort Time-Sharing* (1977) 57 Ore.L.Rev. 32.) Since then, the numbers of timeshare projects and timeshare owners have grown rapidly, from 240 projects and less than 100,000 households owning timeshares in 1978 to more than 1500 projects and over 1.6 million household owners in 1995. (Am. Resort Dev. Assn., Timeshare Purchasers: Who They Are, Why They Buy (1995) p. vi.) Perhaps because of its origins in the marketing of distressed property and the hard-sell tactics of its early promoters, the timeshare industry has had to contend with a somewhat

---

[2] The Legislature is the ultimate administrator of public trust lands and may prescribe such terms and priorities as it deems appropriate. (*County of Orange* v. *Heim* (1973) 30 Cal.App.3d 694, 707.)

[3] Statutory land use controls affecting shoreline property on a regional and statewide basis include Government Code sections 66620-66647 [San Francisco Bay Conservation and Development Commission] and Public Resources Code sections 30000-30829 [California Coastal Commission].

[4] We note that the resort would be subject to existing environmental protection requirements, such as those contained in the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.), including where appropriate the preparation of an environmental impact report.

dubious reputation.  However, with larger, well-known developers entering the market and providing quality vacation facilities, the timeshare resort industry is now enjoying a renaissance and its product is playing an increasingly important role among the alternatives available to the vacationing public. (Razzi, *Timeshares Grow Up* (Oct. 1995) Kiplinger Personal Finance Magazine, at p. 67.)

Timeshare unit owners typically have the freedom to stay in a unit for a week, split the use into three- and four-day segments, rent out the unit, or exchange use of the unit with another timeshare owner (normally through a national or international timeshare exchange company). Alternatively, units can be rented by timeshare management companies on a nightly basis to members of the general public on a first come basis if the unit is not timely reserved by the owner.  Each of these contemplated occupancy lengths constitutes "transient occupancy."[5]   Frequently, timeshare units are flexibly designed so they may be temporarily split into two units, with one unit functioning as a hotel room and the other unit functioning as a self-contained apartment complete with kitchen facilities. One study has found that on a typical day, 12.4 percent of all available use intervals go unused by timeshare owners and that another 5.6 percent of the units are rented to the public.  (Am. Resort Dev. Assn., Timeshare Purchasers: Who They Are, Why They Buy, *supra,* p. 33.)   It thus may be estimated that 18 percent of the units in a timeshare resort are available for rental to the general public at any given time.

## B.   THE PUBLIC TRUST DOCTRINE

The origin and purposes of the public trust doctrine in California were briefly summarized by the Supreme Court in *National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 433-434:

"`By the law of nature these things are common to mankind -- the air, running water, the sea and consequently the shores of the sea.' (Institutes of Justinian 2.1.1.) From this origin in Roman law, the English common law evolved the concept of the public trust, under which the sovereign owns `all of its navigable waterways and the lands lying beneath them "as trustee of a public trust for the benefit of the people."' (*Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 416.)  The State of California acquired title as trustee to such lands and waterways upon its admission to the union [citation]; from the earliest days [citation] its judicial decisions have recognized and enforced the trust obligation.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The objective of the public trust has evolved in tandem with the changing public perception of the values and uses of waterways.  As we observed in *Marks* v. *Whitney*, *supra*, 6 Cal.3d 251, `[p]ublic trust easements [were] traditionally defined in terms of navigation, commerce and fisheries.  They have been held to include the right

---

[5] Transient occupancy is generally defined by statute as being less than 30 days.  (See Health & Saf. Code, § 37912, subd. (k); Rev. & Tax. Code, §§ 7280-7281.)

to fish, hunt, bathe, swim, to use for boating and general recreation purposes the navigable waters of the state, and to use the bottom of the navigable waters for anchoring, standing, or other purposes.' (P. 259.) We went on, however, to hold that the traditional triad of uses -- navigation, commerce and fishing -- did not limit the public interest in the trust res. In language of special importance to the present setting, we stated that `[t]he public uses to which tidelands are subject are sufficiently flexible to encompass changing public needs. In administering the trust the state is not burdened with an outmoded classification favoring one mode of utilization over another.' [Citation.]" (Fns. omitted.)

The powers and duties of a trustee of public trust lands were addressed by the United States Supreme Court in *Illinois Central Railroad* v. *Illinois* (1892) 146 U.S. 387, still regarded as the seminal case on the scope of the public trust doctrine.[6] In *Illinois Central* the court held that the State of Illinois could not grant a major portion of the Chicago waterfront to a railroad company, stating in part:

". . . It is grants of parcels of lands under navigable waters, that may afford foundation for wharves, piers, docks and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or of a sea or lake. Such abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust, devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled. . . . The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers

---

[6] (See *National Audubon Society v. Superior Court, supra,* 33 Cal.3d at 437; *City of Berkeley* v. *Superior Court* (1980) 26 Cal.3d 515, 521.)

in the administration of government and the preservation of the peace.  In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the State the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes.  So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the State."  (*Id.*, at pp. 453-454.)

The court concluded:

". . . The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State.  The trust with which they are held, therefore, is governmental and cannot be alienated, except in those instances mentioned of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining."  (*Id.*, at pp. 455-456.)

A key principle upon which the court relied in reaching its conclusion was the need to protect the ability of future legislatures to make sound decisions regarding trust property:  "[E]ach [legislature] should be able, at all times, to do whatever the varying circumstances and present exigencies attending the subject may require . . . ."  (*Id.*, at p. 459.)  More specifically:

". . . The legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances.  The legislation which may be needed one day for the harbor may be different from the legislation that may be required at another day."  (*Id.*, at p. 460.)

The principles of *Illinois Central* were applied to California tidelands in *People* v. *California Fish Co.* (1913) 166 Cal. 576, where the state sought to quiet its title to certain submerged and tidal lands sold under general statutes authorizing the sale of proprietary lands of the state.  The court took note of article XV, section 2 [now article X, section 4] of the Constitution which provided:

"No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this state, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this state shall be always attainable for the people thereof."

The court stated:

". . . the defendants, as against the State of California, do not hold the entire title and interest in the tide lands, but that their respective estates in such land, if any

they have, are each subject to the easement and servitude of the public for purposes of navigation and for commerce by means of navigation, and to the public right of free access to the navigable waters over the frontage, whenever it is necessary for such public purpose."  (*Id*., at p. 589.)[7]

The court later elaborated upon its reasoning:

"[T]he buyer of land under these statutes received the title to the soil, the *jus privatum*, subject to the public right of navigation, and in subordination to the right of the state to take possession and use and improve it for that purpose, as it may deem necessary.  In this way the public right will be preserved and the private right of the purchaser will be given as full effect as the public interests will permit.  The purchaser will not obtain the absolute ownership, unless the public authorities, by erecting a sea-wall or otherwise improving the premises for navigation, exclude his land or part thereof from the public use and it becomes unnecessary for access or approaches thereto, as in the case of the San Francisco water lots.  The public servitude would then be removed from such excluded land."  (*Id.*, at p. 596.)

The next major case in the development of the public trust doctrine in California was *Boone* v. *Kingsbury* (1928) 206 Cal. 148.  There the question was whether private parties could be granted permits allowing them to prospect for oil and other mineral deposits on tidal and submerged lands held in trust by the state; the parties would lease the lands on a royalty basis.  The court first pointed out that gasoline production was of vital importance to commerce and that courts should not hamper the state and national policy favoring the development of oil and gas resources except for the most practical and substantial reasons.  The court observed that the permit was in the form of a lease and that "[i]n no sense does the state part with title to its tide-lands."  (*Id*., at p. 182.)[8]  Additionally,

---

[7]  The court also determined that the same conclusion would follow from a consideration of the statutes under which the tidelands were sold.  While authorizing the sale of tidelands, the statutes were concerned with the reclamation of land suitable for agriculture, and their "apparent neglect and failure even to mention the paramount interests of navigation shows that there was no intention to deal with that subject or to affect the public easement for that purpose." (*Id.*, at p. 592.)

[8]  None of the lands fell within the terms of article XV, section 3 [now article X, section 3] of the Constitution, which at that time provided:

"All the tide lands within two miles of any incorporated city or town in this state, and fronting on the waters of any harbor, estuary, bay or inlet, used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships, or corporations."

Article X, section 3, is identical to its predecessor except that it adds the following proviso:

". . . provided, however, that any such tidelands, reserved to the State solely for street purposes, which the Legislature finds and declares are not used for navigation purposes and are not necessary for such purposes may be sold to any town, city, county, city and county, municipal corporations, private persons, partnerships or corporations subject to such conditions as the Legislature determines are necessary to be imposed in connection with any such sales in order to

the licensed activity would be "restricted to as small a portion of the surface area as may be reasonably required for mining and removing [the mineral] deposits." (*Ibid*.) The court noted that "[i]n this respect the instant case is widely different from *Illinois Cent. R.R. Co.* v. *People of the State of Illinois*," where "the state undertook to grant into exclusive private ownership 1,000 acres of the submerged beds of Lake Michigan, constituting a large acreage of the city of Chicago's waterfront, freed of any public easement." (*Id.*, at pp. 182-183.) Applying the test from *Illinois Central*, the court found that "there was nothing in the drilling and operation of oil wells conducted in the manner provided by the statute that would substantially impair the paramount public interest in the lands and water remaining. . . ." (*Id.*, at p. 183.) Nor did the grants "impair the power of succeeding legislatures to regulate, protect, improve or develop the public rights of navigation and fishing." (*Ibid*.) Citing *Ward* v. *Mulford* (1867) 32 Cal. 365, the court noted that "[t]he trust in which tide and submerged lands are held does not prevent the state from reclaiming tide and submerged lands from the sea where it can be done without prejudice to the public right of navigation and applying them to other purposes and skills." (*Id.*, at p. 189.) The court observed that "when great public interest may be subserved by the alienation of parcels of tide and submerged land the state's determination of the question in favor of alienation will not be disturbed by the courts." (*Id.*, at p. 192.)

More recently, in *Colberg, Inc.* v. *State of California ex rel. Dept. Pub. Wks.* (1967) 67 Cal.2d 408, the court examined the claims of shipyard owners that the erection of a low-level freeway bridge across the upper Stockton channel, a navigable waterway, would curtail access to their shipyards. The court responded:

> "The nature and extent of the trust under which the state holds its navigable waterways has never been defined with precision, but it has been stated generally that acts of the state with regard to its navigable waters are within trust purposes when they are done `for purposes of commerce, navigation, and fisheries for the benefit of all the people of the state.' [Citations.]" (*Id.*, at p. 417.)

The court cited *Boone* v. *Kingsbury*, among other cases, for the proposition that "[t]he courts have construed the purposes of the trust with liberality to the end of benefiting all the people of the state." (*Id.*, at pp. 417-418.) The court found that the state was acting within the scope of trust purposes: "The state, as trustee for the benefit of the people, has the power to deal with its navigable waters in any manner consistent with the improvement of commercial intercourse, whether navigational or otherwise." (*Id.*, at p. 419.) The fact that access to navigable waters would be impaired to some degree by the bridge did not mean that the public trust servitude was being ignored. As the court explained:

> "The limitation of the [public trust] servitude to cases involving a strict navigational purpose stems from a time when the sole use of navigable waterways for purposes of commerce was that of surface water transport. [Citation.] That time is no longer with us. The demands of modern commerce, the concentration of population in urban centers fronting on navigable waterways, the achievements of science in devising

---

protect the public interest."

new methods of commercial intercourse -- all of these factors require that the state, in determining the means by which the general welfare is best to be served through the utilization of navigable waters held in trust for the public, should not be burdened with an outmoded classification favoring one mode of utilization over another."  (*Id.*, at pp. 421-422.)

In *Marks* v. *Whitney, supra*, 6 Cal.3d 251, a quiet title action between private parties, the plaintiff asserted ownership of certain tidelands and the right to fill and develop them.  The defendant, owner of upland property adjoining the tidelands,  countered that plaintiff's title was burdened with a public trust easement.  In resolving the issue, the court described the public trust easements as follows:

"Public trust easements are traditionally defined in terms of navigation, commerce and fisheries.  They have been held to include the right to fish, hunt, bathe, swim, to use for boating and general recreation purposes the navigable waters of the state, and to use the bottom of the navigable waters for anchoring, standing, or other purposes. [Citations.]"  (*Id.*, at p. 259.)

Citing *Colberg*, it stated:

"The public uses to which tidelands are subject are sufficiently flexible to encompass changing public needs.  In administering the trust the state is not burdened with an outmoded classification favoring one mode of utilization over another."  (*Ibid.*)

It went on to state:

"There is a growing public recognition that one of the most important public uses of the tidelands -- a use encompassed within the tidelands trust -- is the preservation of those lands in their natural state, so that they may serve as ecological units for scientific study as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area.  It is not necessary to here define precisely all the public uses which encumber tidelands."  (*Id.* at pp. 259-260.)

The plaintiff was deemed to be in the same position as was the defendant in *People* v. *California Fish Co.*, that is,

". . . he owns `the soil, subject to the easement of the public for the public uses of navigation and commerce, and to the right of the state, as administrator and controller of these public uses and the public trust thereof, to enter upon and possess the same for the preservation and advancement of the public uses and to make such changes and improvements as may be deemed advisable for these purposes.'"  (*Id.*, at p. 261.)

Noting that "[w]e are not here presented with any action by the state . . . modifying, terminating, altering or relinquishing the jus publicum [public right] in these tidelands" (*id.*, at p. 260), the court held that members of the public may lawfully assert or exercise public trust rights on privately owned tidelands.  (*Id.*, at p. 261.)

Finally, in *National Audubon Society* v.  *Superior Court, supra*, 33 Cal.3d 419, the public trust doctrine was invoked by the plaintiffs in seeking to protect the recreational and ecological values of Mono Lake, a navigable waterway.  The court reviewed each of the cases discussed above and determined that the state had a duty under the public trust doctrine "to protect the people's common heritage of streams, lakes, marshlands and tidelands . . . ." and that the state could "surrender[] that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust."  In arriving at its conclusion, the court relied on various principles from its earlier decisions, among them that "the traditional triad of uses -- navigation, commerce and fishing -- did not limit the public interest in the trust res"  (*id.*, at p. 434); that "the public trust doctrine does not prevent the state from choosing between trust uses" (*id.*, at p. 440); and that  "`trust uses' relate to uses and activities in the vicinity of the lake, stream, or tidal reach at issue."  (*Ibid*.)

## C.  LEASING OF TIDELANDS TRUST PROPERTY

The state, as trustee, may commit the administration of public trust lands to a local public agency.  (*City of Long Beach* v. *Lisenby* (1917) 175 Cal. 575, 579; *Graf* v. *San Diego Unified Port Dist.* (1992) 7 Cal.App.4th 1224, 1229.)  The local agency grantee may in turn lease the trust lands to private parties for purposes consistent with the trust.  (*San Pedro etc. R.R. Co.* v. *Hamilton* (1911) 161 Cal. 610, 619.)  The state or its grantee may lease portions of tide and submerged lands for strictly private purposes consistent with the trust and, by so doing, preclude public use of those leased lands.  (61 Ops.Cal.Atty.Gen. 56, 59-61 (1978).)

It is settled that a lease does not constitute a grant or sale within the meaning of section 3 of article X (formerly, article XV) of the Constitution.  (*City of Long Beach* v. *Vickers* (1961) 55 Cal.2d 153, 161.)  In *San Pedro etc. R.R. Co.* v. *Hamilton, supra*, 161 Cal. at 620-621, the court explained:

> ". . . The purpose of the constitutional provision was not to blight commercial enterprise, but to foster it.  It is designed to foster it by preventing the alienation into private ownership of the fee of such lands, whereby all might be acquired and held in private ownership to the destruction of the public use.  But it did not mean to abort commerce in embryo or to strangle it in its infancy by putting a ban upon the activities of private commercial enterprises. . . .  To hold that the state or that municipalities acting as its mandataries, may not lease, with proper restrictions of time and proper regard to public and *quasi* public use, lands such as these, so that private enterprise and capital may build up the commerce of our seaport cities, is to declare that all such commerce must await the slow and frequently incompetent initiative of the municipalities themselves -- municipalities which frequently are unwilling to incur the expense and risk which would be accepted under reasonable terms by private citizens. . . .  In the case of sale the title and control over the land are gone.  In the case of leases

all proper restrictions may be cast about the use. An entry by the lessor may be had for breach of covenant: possession of the land with its improvements after the term of years returns to the municipality and state, and in the meantime the interests of navigation and commerce are not impaired, but are in the highest degree stimulated and fostered. The lease in this instance is typical. Vast expenditures were made which the lessor would never have made, and to a portion of land -- a mere fragment of all of the like water-front lands -- access is given to a transcontinental railroad for all purposes of inland and marine commerce, while at the expiration of the term of the lease the possession of the lands returns to the state. What policy more beneficial to the state itself than this it would not be easy to point out."

The private commercial activity which may take place on leased tidelands was given further definition in *Martin* v. *Smith* (1960) 184 Cal.App.2d 571. There certain tidelands were leased by the State Lands Commission to a private corporation for "lawful commercial purposes, the construction, maintenance and use of a yacht harbor and structures and facilities connected thereto." Shortly thereafter, the Legislature granted tide and submerged lands, which included the leased property, to the City of Sausalito. The grant was made subject to the existing lease and provided that the city could lease the granted lands for up to 50 years "for purposes consistent with the trust upon which said lands are held by the State of California and with the requirements of commerce and navigation at said harbor, and collect and retain rents from such leases. . . ." (*Id.*, at p. 574.) With the city's approval the lessee then entered into a sublease for the construction of "a first-class restaurant with a cocktail lounge, and, thereafter, small shops and other improvements," including a motel. (*Id.*, at p. 577.) The court found that the term "commercial purposes" in the original lease contemplated the conduct of business on the leased property in addition to harbor uses. The court stated that "such purposes are consistent with the trust upon which said lands were conveyed to the city, and with the requirements of commerce and navigation of [said] harbor." (*Id.*, at p. 578.) Concluding its analysis, the court invoked Supreme Court precedent:

". . . The term `commercial purposes' in the master lease must be interpreted in view of the holding in *San Pedro etc. R.R. Co.* v. *Hamilton* (1911) 161 Cal. 610: `The purpose of the constitutional provision [Const., art. XV, § 3, dealing with tidelands] was not to blight commercial enterprise, but to foster it.' (P. 620.)" (*Ibid.*)

## D. CONSISTENCY WITH TRUST PURPOSES

With the foregoing case law in mind, we turn to a consideration of whether timeshare resorts are *per se* inconsistent with the public trust use of filled tidelands property. In order to analyze the issue of the compatibility of timeshare resorts with the public trust doctrine and the use of filled tidelands, we consider an exemplar timeshare resort[9] with features frequently found at contemporary timeshare style developments: a vacation-oriented development in which purchasers receive the right to occupy one of the units within the development for one week each year. Absent termination of the

---

[9]  This opinion addresses a broad question of law and is not intended to supplant the land use review, analysis and permitting functions of governmental authorities and public agency trustees.

public trust, public trust land may not be sold. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 482.) We therefore assume the timeshare resort would occupy public trust land pursuant to a ground lease.[10] Consequently, an owner's[11] right to occupy a unit would terminate with the ground lease, at which time the property and all improvements thereon would revert to the public agency. The exemplar resort would physically resemble a typical vacation-hotel resort, and include such amenities as kitchen facilities in each unit, housekeeping, swimming pools, concierge service and a lobby area for check-ins by both owners and renters. We also assume the resort would afford improved access to the shoreline for use by the general public.

The consistency of any timeshare resort with public trust purposes must be determined in light of the totality of the circumstances, paying particular attention to (1) whether the state, through its local trustee, has given up its right of control over the trust property (e.g., *Illinois Central Railroad* v. *Illinois*, *supra*, 146 U.S. 387; *Boone* v. *Kingsbury*, *supra*, 206 Cal. 148; *Marks* v. *Whitney*, *supra*, 6 Cal.3d 251; *San Pedro etc. R.R. Co.* v. *Hamilton*, *supra*, 161 Cal. 610), (2) whether the use substantially impairs the public's interest in the remaining lands and waters (e.g., *Illinois Central Railroad* v. *Illinois*, *supra*, 146 U.S. 387; *People* v. *California Fish Co.*, *supra*, 166 Cal. 576), and (3) whether the use produces a public benefit which furthers and promotes trust purposes (e.g., *National Audubon Society* v. *Superior Court*, *supra*, 33 Cal.3d 419; *Boone* v. *Kingsbury*, *supra*, 206 Cal. 148; *Colberg, Inc.* v. *State of California ex rel. Dept. Pub. Wks.*, *supra*, 67 Cal.2d 408).

Applying the foregoing criteria to the factual setting of our exemplar resort, we first note that the land in question would be leased, not sold in fee. Upon expiration of the ground lease, all interest in the improvements would revert back to the local agency which holds the property in trust. No abandonment of the public right would occur and succeeding legislative bodies would retain the ability to protect trust values. Second, public access to the shoreline could be enhanced through the development of walkways, access paths, and marina-like facilities, thus increasing and improving opportunities for boating, fishing, swimming, hiking and other recreational uses. Impairment of the public interest in the trust lands is a fact specific inquiry which requires an understanding of how much tideland property would be committed to the timeshare resort relative to adjacent public trust land. Such an analysis is beyond the scope of this opinion, but is a factor that must be assessed by the public agency trustee. (See *Illinois Central Railroad* v. *Illinois, supra*, 146 U.S. at 453-454; *National Audubon Society* v. *Superior Court, supra,* 33 Cal. 3d at 438; *Boone* v. *Kingsbury, supra,* 206 Cal. at 189.)

---

[10] Civil Code section 718 allows tidelands to be leased for a maximum of 66 years, while some specific statutory grants permit leases for a lesser period of time, for example, 50 years.

[11] No fee simple interest would be conveyed to an owner because of the reversion upon expiration of the ground lease. The timeshare would be considered an interest in real property in the nature of a lease. (*Cal-Am Corp.* v. *Department of Real Estate* (1980) 104 Cal.App.3d 453, 457.) Its sale would be subject to regulation as a "time-share estate" which is defined as "a right of occupancy in a time-share project coupled with an estate in real property." (Bus. & Prof. Code, § 11003.5.) A "timeshare project" is regulated as a subdivision. (Bus. & Prof. Code, §§ 11000, 11004.5; Cal. Code Regs., tit. 10, § 2810 et seq.)

We now address the third criterion, that is, whether our exemplar resort would produce a public benefit which furthers and promotes trust purposes. As a commercial activity, timeshare resorts promote the public's use of the shoreline by providing transient lodging accommodations, facilities, and services on a portion of the agency's trust property.[12] Again, depending on project specifics, visitation of existing public trust property, by both owners and the general public, may be improved or enhanced by access paths to the shoreline, and related public facilities (e.g., benches, water fountains, restrooms). As such, the use of the property as a timeshare resort may be considered incidental and ancillary to the promotion of trust purposes. (See *City and County of S.F.* v. *Linares* (1940) 16 Cal.2d 441, 445 ["`the creation of hotels, restaurants, museums, art-galleries, zoological and botanical gardens, conservatories, and the like in public parks is common, and . . . their establishment has been generally recognized as ancillary to the complete enjoyment by the public of the property set apart for their benefit'"].) This is not the case of, for example, an automobile repair shop which would have no inherent connection with shoreline uses and would manifestly fail the public benefit element of the totality of circumstances test. (See *National Audubon Society* v. *Superior Court, supra,* 33 Cal.3d at 440.)

We recognize that the preservation of open space is also a trust use. (*Marks* v. *Whitney, supra,* 6 Cal.3d at 259-260.) To the extent that a timeshare resort or any other type of lodging facility is built upon public trust lands, a loss of open space will occur. However, as noted in *National Audubon Society* v. *Superior Court, supra,* 33 Cal.3d at 439, footnote 21: "*Colberg* demonstrates the power of the state [and any local government grantee], as administrator of the public trust, to prefer one trust use over another." A public agency trustee might determine that a timeshare resort would promote greater recreational use of the property by more persons, including members of the general public, than would a nature preserve or other form of open space. Whether a particular portion of filled tidelands should be used for open space, for a seaside resort, or for some other commercial or recreational use would be a matter to be determined by the public agency in accordance with the grant from the state.[13] Public agency trustees may administer trust property in a "sufficiently flexible [manner] to encompass changing public needs" (*Marks* v. *Whitney, supra,* 6 Cal.3d at 259), subject to the administration and control of the State Lands Commission (Pub. Resources Code, §§ 6301, 6306).

Finally, it is to be noted that in 1982, we provided informal advice regarding whether timeshare developments could be found consistent with the public trust doctrine. We determined that such developments constituted long term residential uses which did not benefit the public at large, and therefore could not be found consistent with the public trust doctrine. We acknowledged that hotels were an appropriate use of public trust property but considered timeshare units to be more like private residences than hotel rooms because of their limited availability to the general public. Among the factors we cited in support of our conclusion were: (1) the much greater number of persons who may

_____

[12] It is observed that tourism is a mainstay of the California economy.

[13] A wide range of uses has been permitted under grants from the state. (See Cal. Lands Com., Rep. On The Use, Development, And Administration Of Granted Tidelands And Submerged Lands (1976) pp. 12-18; see also, *Haggerty* v. *City of Oakland* (1958) 161 Cal.App.2d 407 [construction of a convention and banquet hall for use by trade, shipping, and commercial organizations on filled tide and submerged lands that had been granted in trust to the city found consistent with the terms of the grant].)

use an individual hotel room on an annual basis compared to the number who may use a timeshare unit; (2) statistics showing that in 1978, only 21 percent of timeshare owners traded their time interval through a major exchange program and that the trend seemed to be toward less participation in exchange programs; and (3) a relatively low vacancy factor for timeshare resorts which diminished the availability of units for public rental. However, the situation with respect to today's timeshare development, as described above, is much different.

An analysis of "residential use" requires consideration of two relevant concepts: duration and exclusivity of ownership. Timeshare resorts blur the lines of these concepts in several respects. First, timeshare owners today do not own a particular unit within the development and are now generally limited to a one-week stay rather than the full 30 days on which our earlier analysis was predicated. Moreover, the one-week use may be split into three- and four-day segments, and the unit itself may be divided so that two separate parties may use it at the same time. The shorter intervals and the flexible arrangements for use of the units mean that the usual timeshare resort is now accessible to a great many more individuals than in 1982 and move the concept of a timeshare development much closer to that of a hotel.

Second, timeshare owners' exchange privileges are in much greater use today, and the trend has been in a strongly upward direction since the late 1980's. In a 1995 survey conducted by the same research organization whose data was relied upon in our 1982 analysis, it was found that 81 percent of timeshare owners have traded their time interval through a major exchange program. (Am. Resort Dev. Assn., Timeshare Purchasers: Who They Are, Why They Buy, *supra*, p. 40.) Thus the average duration of stay in a timeshare unit coupled with an active exchange program renders the use of timeshare resorts by interval owners more like hotels and vacation resorts than a "residential use."

We recognize that a resort's exchange program is limited to timeshare interval owners, not the general public. With respect to the rental of the units to the public, while it remains true that vacancy rates are relatively low at timeshare resorts compared to hotels, these rates are computed *after* unit rentals to the public are taken into account. As indicated above, approximately 18 percent of the units in a modern timeshare resort are available for rental to the general public at any given time. This represents a substantial portion of the timeshare resort and, again when coupled with the high rate of exchange use and shorter intervals, means that timeshare resorts are functionally more akin to hotels and other places of public accommodation than they are to private residential enclaves. Moreover, commentators have stated that while becoming more "hotel-like," timeshare resorts provide benefits to the vacationing public that hotels cannot generally match. With their exchange privileges to provide variety, their flexible living arrangements, and their enhanced on-site recreational opportunities, modern timeshare resorts are much more conducive to the "mini-vacations" which have become increasingly popular with and important to dual income earners and families with children. Accordingly, timeshare resorts have come to play a major role in serving the vacation needs of the American public. Under these circumstances, we can no longer conclude that timeshare resorts are generally more akin to long term residential uses than to hotels and other places of public accommodation and hence fail to afford sufficient public benefit to permit placement on public trust lands.[14]

---

[14]   While the evolution of the timeshare industry provides a strong basis for revising our 1982 conclusion, we stress

Given the foregoing considerations, we conclude that timeshare resort projects are not *per se* incompatible with the public trust doctrine and that a local government trustee may, consistent with the public trust doctrine, lease a portion of filled tidelands to a private party for the construction of a timeshare resort if the project will provide for significant use by members of the general public and further trust uses by increasing opportunities for public access to the shoreline and water-oriented recreation.

* * * * *

that each project must be considered separately. Factors relevant to the public benefit equation could include, but are not limited to, the purchase price of the timeshare interval, the ability to exchange the intervals, the estimated vacancy rate, and the project's availability for use by the general public.